UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DANA LOPES,
    Plaintiff,

        v.                                    CIVIL ACTION NO.
                                             14-10679-NMG

GERALDINE RIENDEAU, RN, BARBARA BERG,
LPN, UMASS CORRECTIONAL HEALTH, Program
Services, DYANA NICKL, Senior Director
of Program UMass Corr. Health, LAWRENCE
WEINER, Assistant Deputy Commissioner of
Clinical Services, SHAWNA NASUTI, NP,
PAUL CARATAZZOLA, LICSW, Administrator of
Health Services, PAT DAVENPORT-MELLO, HSA of
Nursing and MASSACHUSETTS PARTNERSHIP OF
CORRECTIONAL HEALTHCARE,
    Defendants.

**REPORT AND RECOMMENDATION RE:
MOTION TO DISMISS AND/OR MOTION FOR SUMMARY
JUDGMENT BY DEFENDANTS BARBARA BERG, SHAWNA NASUTI,
PAUL CARATAZZOLA, PATRICIA DAVENPORT-MELLO,
AND MASSACHUSETTS PARTNERSHIP FOR CORRECTIONAL
HEALTHCARE (DOCKET ENTRY # 32); DEFENDANT UMASS
CORRECTIONAL HEALTH'S MOTION TO DISMISS
(DOCKET ENTRY # 26)**

**March 2, 2015**

**BOWLER, U.S.M.J.**

    Pending before this court is a motion to dismiss filed by

defendant UMass Correctional Health[1] ("UMCH") under Fed.R.Civ.P.

12(b)(1) ("Rule 12(b)(1)").  (Docket Entry # 26).  Also pending

before this court is a motion for summary judgment filed by

---

[1]  The complaint refers to both UMass Correctional Health
Services and UMass Correctional Health.  The latter entity
provided medical services to inmates at Old Colony Correction
Center ("OCCC") in Bridgewater, Massachusetts.  This court
therefore construes the pro se complaint as naming UMass
Correctional Health as a defendant.

defendants Barbara Berg ("Berg"), Shawna Nasuti ("Nasuti"), Paul

Caratazzola ("Caratazzola"), Patricia Davenport-Mello

("Davenport") and Massachusetts Partnership for Correctional

Healthcare ("MPCH") (collectively "MPCH defendants") under

Fed.R.Civ.P. 56 ("Rule 56"). (Docket Entry # 32).

<u>PROCEDURAL BACKGROUND</u>

Plaintiff Dana Lopes ("plaintiff"), an inmate at OCCC, filed

this civil rights action pro se seeking medical care in the form

of alternative medications to treat his hepatitis C and, once

stabilized, a liver transplant. (Docket Entry # 1, ¶¶ 18, 24).

He alleges that defendants Geraldine Riendeau ("Riendeau"),

Lawrence Weiner ("Weiner"), Dyana Nickl ("Nickl"), UMCH, Berg,

Nasuti, Caratazzola, Davenport and MPCH ("defendants") were

deliberately indifferent to his serious medical needs in

violation of the Eighth Amendment. The complaint sets out causes

of action for denied or inadequate medical care under: (1) 42

U.S.C. § 1983 ("section 1983"); (2) Article 26 of the

Massachusetts Constitution; and (3) the Massachusetts Tort Claims

Act, Massachusetts General Laws chapter 258, section two

("MTCA").[2] In addition to access to the alternative medications

---

[2] Paragraph 23, captioned "Causes of Action, reads as follows:

Your plaintiff has stated a cause of action under the 8th
Amendment to the United States Constitution as described by
Title 42 USC section 1983 and Title 42 USC chapter 157, the
fledgling Affordable Healthcare for all Americans Act of
2010.

and a liver transplant, plaintiff seeks compensatory and punitive

damages.  (Docket Entry # 1, ¶¶ 18, 24).

In seeking dismissal under Rule 12(b)(1), UMCH argues that

it is an agency of the Commonwealth of Massachusetts and thus

entitled to immunity under the Eleventh Amendment.  (Docket Entry

# 26).  The MPCH defendants move to dismiss the complaint under

Rule 12(b)(6) because plaintiff:  (1) failed to exhaust the

administrative remedies available to him before filing suit in

violation of the Prison Litigation Reform Act, 42 U.S.C. §

1997e(a) ("PLRA"); (2) "failed to allege sufficient facts to

support his conclusion that Defendants violated his civil rights

because plaintiff is not entitled to treatment of his choice";

and (3) has no section 1983 claim against Nasuti.  (Docket Entry

# 33).

---

Further, under the Massachusetts Declaration of Rights,
under the Mass Tort Claims Act, your plaintiff has a
parallel right to be free from cruel and unusual punishment.
Defendants have displayed deliberate indifference and it may
well cost the plaintiff his life.  He has a cause of action
against he defendants in their individual and official
capacities.

(Docket Entry # 1, ¶ 23).
    Because this paragraph is clear and precise in terms of
identifying the causes of action as grounded upon denied or
inadequate medical care under the Eighth Amendment and state law,
if plaintiff wishes to include any other cause of action raised
by the facts, including one based on retaliation, he must file a
timely motion for leave to amend the complaint.  In addition,
although plaintiff seeks to hold all defendants liable under "42
U.S.C. c. 157, the fledgling Affordable Health Care for all
Americans Act," this part of the statute does not contain a cause
of action.

I.  <u>MPCH Defendants' Motion for Summary Judgment</u>

<u>STANDARD OF REVIEW</u>

Summary judgment is designed "'to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required.'"  <u>Tobin v. Federal Express Corp.</u>, 2014 WL 7388805, at *2 (1st Cir. Dec. 30, 2014) (quoting <u>Wynne v. Tufts University School of Medicine</u>, 976 F.2d 791, 794 (1st Cir. 1992)).  It is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(a).  It is inappropriate "if the record is sufficiently open-ended to permit a rational factfinder to resolve a material factual dispute in favor of either side."  <u>Pierce v. Cotuit Fire District</u>, 741 F.3d 295, 301 (1st Cir. 2014); <u>see</u> <u>also</u> <u>Ruiz-Rosa v. Rullan</u>, 485 F.3d 150, 155 (1st Cir. 2007) (applying same legal standard applied by district court when reviewing summary judgment ruling).

"Genuine issues of fact are those that a factfinder could resolve in favor of the nonmovant, while material facts are those whose 'existence or nonexistence has the potential to change the outcome of the suit.'"  <u>Green Mountain Realty Corp. v. Leonard</u>, 750 F.3d 30, 38 (1st Cir. 2014) (quoting <u>Tropigas de Puerto Rico, Inc. v. Certain Underwriters at Lloyd's of London</u>, 637 F.3d 53, 56 (1st Cir. 2011)).  The evidence is viewed "in the light most favorable to the non-moving party" and "all reasonable

4

inferences" are drawn in his favor.  <u>Ahmed v. Johnson</u>, 752 F.3d 490, 495 (1st Cir. 2014).  In reviewing a summary judgment motion, a court may examine "all of the record materials on file," <u>Geshke v. Crocs, Inc.</u>, 740 F.3d 74, 77 (1st Cir. 2014), "including depositions, documents, electronically stored information, affidavits or declarations . . . or other material." Fed.R.Civ.P. 56(c)(1); <u>see</u> <u>Ahmed v. Johnson</u>, 752 F.3d at 495. "Unsupported allegations and speculation," however, "do not demonstrate either entitlement to summary judgment or the existence of a genuine issue of material fact sufficient to defeat summary judgment." <u>Rivera-Colon v. Mills</u>, 635 F.3d 9, 12 (1st Cir. 2011); <u>see</u> <u>Serra v. Quantum Servicing, Corp.</u>, 747 F.3d 37, 40 (1st Cir. 2014) ("allegations of a merely speculative or conclusory nature are rightly disregarded").

In the event a complaint is verified, it is appropriate to consider factual averments based on personal knowledge therein as the equivalent of an affidavit for purposes of summary judgment. <u>Sheinkopf v. Stone</u>, 927 F.2d 1259, 1262-1263 (1st Cir. 1991). Plaintiff signed the complaint as "Sworn under pain and penalty of perjury." (Docket Entry # 1).  Accordingly, facts based on personal knowledge in the complaint are properly part of the summary judgment record.  <u>See</u> <u>Goldman, Antonetti, Ferraiuoli, Axtmayer & Hertell v. Medfit International, Inc.</u>, 982 F.2d 686, 689-690 (1st Cir. 1993) (noting that pursuant to 28 U.S.C. § 1746 "an unsworn statement signed under penalty of perjury may be

used, in lieu of a sworn statement or affidavit, to support or oppose a motion for summary judgment"); <u>United States v. Gomez-Vigil</u>, 929 F.2d 254, 258 (6th Cir. 1991) (28 U.S.C. § 1746 "allows use of 'unsworn declaration under pain and penalty of perjury' in lieu of sworn oaths"); <u>Uncle Henry's, Inc. v. Plaut Consulting, Inc.</u>, 240 F.Supp.2d 63, 69 (D.Me. 2003) ("[a]ffidavits need not be notarized to be cognizable on summary judgment so long as they are made under penalties of perjury in accordance with 28 U.S.C. § 1746"). Conclusory allegations in the complaint, however, "do not pass muster, and hence, must be disregarded." <u>Sheinkopf v. Stone</u>, 927 F.2d at 1259, 1262 <u>Id.</u> at 1262. Adhering to this framework, the record sets out the following facts for purposes of the MPCH defendants' summary judgment motion.

FACTUAL BACKGROUND

Throughout the relevant time period, plaintiff was an inmate residing at OCCC. (Docket Entry # 1). Prior to July 2013, UMCH provided medical care to inmates at OCCC. Thereafter, the Massachusetts Department of Correction ("DOC") contracted with MPCH to provide medical services to OCCC inmates. (Docket Entry # 33-1).

Plaintiff, a 60 year old male, has a history of hepatitis C, a chronic liver disease. (Docket Entry ## 1-2, 1-4). He is confined to a wheelchair. (Docket Entry # 1-2). In 2006 and 2007, plaintiff received pegylated interferon and ribavirin

therapy to treat the hepatitis C.  (Docket Entry # 1-2).  The
drug regimen ended, however, because plaintiff developed "retina
changes."  (Docket Entry # 1-2) (Docket Entry # 1, ¶ 6).  Neither
UMCH nor MPCH provided or offered plaintiff an alternative
treatment for his hepatitis C.  (Docket Entry # 1).

In 2011, the Food and Drug Administration ("FDA") approved
two new medications to treat hepatitis C, namely, Boceprevir and
Telaprevir.  (Docket Entry # 1, ¶ 8) (Docket Entry # 33, ¶ 6).
To date, plaintiff has not received these new medications.[3]
(Docket Entry # 40-2) (Docket Entry # 1, ¶ 8).

On May 17, 2012, plaintiff was seen by "multiple providers"
at "the HCC clinic" at UMass Memorial Medical Center in
Worcester, Massachusetts ("the clinic").  (Docket Entry # 1-2).
The purpose of the visit was to assess plaintiff's "[c]hronic
hepatitis C, cirrhosis and liver mass."  (Docket Entry # 1-2).  A
September 2008 CAT scan revealed the liver mass.  Plaintiff was
initially "followed by Dr. Robert Martell, M.D. at Tufts Medical
Center."  (Docket Entry # 1-2).  "Preliminary reports" included
information "consistent with HCC."[4]  (Docket Entry # 1-2).  Repeat
CAT scans in January 2009, February 2010, March 2011 and May 2012

---

[3]  The primary relief plaintiff seeks in the complaint is to
receive these alternative medications to treat his hepatitis C.
Thereafter and once his condition stabilizes, he requests a liver
transplant.  (Docket Entry # 1).

[4]  HCC is an acronym for hepatocellular carcinoma, a cancer that
originates in the liver.

showed no significant change in the size of the lesion.  (Docket Entry # 1-2).  An outpatient consultation report for a May 17, 2012 visit notes that plaintiff "has been followed for a stable hepatic lesion in the setting of hepatitis C and cirrhosis." (Docket Entry # 1-2).

Three radiologists reviewed the May 11, 2012 CAT scan of plaintiff's abdomen and pelvis and took part in a multidisciplinary conference at the clinic on May 17, 2012.  The CAT scan report concluded that the liver mass "should be considered as hepatocellular carcinoma unless proven otherwise" and noted "[c]hanges of advanced cirrhosis."  (Docket Entry # 1-2).  The mass, however, did not show "the classic washout for hepatocellular carcinoma."  (Docket Entry # 1-2).  After an extensive discussion among the medical providers, the group decided to reimage the mass in three to six months but not to perform a biopsy.  (Docket Entry # 1-2).  Six months later in November 2012, plaintiff underwent a fine needle aspiration or "FNA," a radio frequency ablation of the lesion and a biopsy. (Docket Entry # 1, ¶ 9) (Docket Entry # 1-4).  The biopsy "showed just an adenoma," i.e., a benign tumor.[5]  (Docket Entry # 1-4).

Apart from the liver mass, the May 17, 2012 clinic note includes the diagnosis of "hepatitis C with cirrhosis,

_____

[5]  Although the FNA reported adenocarcinoma, upon extensive review by three pathologists and a physician, it was decided that "the FNA was not diagnostic of malignancy."  (Docket Entry # 1-4).

decompensating liver disease." (Docket Entry # 1-2). The note describes plaintiff's medical history as including "[d]ecompensations from his liver disease [that] have included fluid overload, peripheral edema, some fatigue and esophageal varices." (Docket Entry # 1-2). The note unequivocally states, "No plans currently for hep C treatment." (Docket Entry # 1-2).

On December 28, 2012, plaintiff had another CAT scan of his abdomen and pelvis. The scan showed no abnormalities except for a large ablative cavity in the area where the lesion was ablated and a small hepatic lesion. (Docket Entry ## 1-4, 58). On January 31, 2013, plaintiff was seen again at UMass Memorial Medical Center. The clinic note states that, "As a patient with cirrhosis, he is at risk for developing further HCC and will be followed." (Docket Entry # 1-4). Accordingly, the multidisciplinary group decided "to proceed with active surveillance and a followup CT of the chest, abdomen and pelvis in 3 months." (Docket Entry # 1-4). Plaintiff expressed concern to medical providers during both the May 2012 and January 2013 clinic visits that he had liver cancer. The medical notes for the January 31, 2013 visit reflect the following with respect to plaintiff's "hepatitis C induced liver cirrhosis":

> From a hepatic standpoint, this patient does have Child-Puigh A cirrhosis with 6 points. He is well compensated with no regular decompensation and should be continued to be followed regularly by a gastroenterologist regarding his underlying hepatitis C and liver disease.

(Docket Entry # 1-4).

An abdominal CT scan performed in August 2013 showed the above noted right hepatic lesion slightly smaller when compared to the December 2012 CT scan. No other lesion appeared on the August 2013 scan. A December 2013 CT scan showed an additional decrease in the size of the lesion as well as "new clots in his SMV and portal vein." (Docket Entry # 58).

Plaintiff's hepatitis C has a specific viral mutation which predicts resistance to protease inhibitors including Boceprevir and Telaprevir. At an undetermined time, he underwent testing at Boston Medical Center and, after reviewing the tests, an attending physician in the gastroenterology department recommended that plaintiff avoid protease inhibitors. Between February 2014 and February 2015, medical professionals outside OCCC monitored his condition "with multiple lab tests and chronic disease consultations." (Docket Entry # 56-1).

In October 2014, the FDA approved the use of Harvoni to treat chronic hepatitis C. On January 21, 2015, plaintiff was seen in the gastroenterology clinic at Lemuel Shattuck Hospital in Jamaica Plain, Massachusetts to discuss initiating hepatitis C treatment with the new medication. After examining plaintiff and reviewing his medical history and recent blood work, the physician recommended Harvoni to treat plaintiff's hepatitis C. Notably, MPCH medical staff recently approved plaintiff to begin treatment with Harvoni. The treatment is expected to begin in early March 2015.

As to other or related medical conditions, plaintiff "has had DVT in the past"[6] and experiences chronic lower back pain. (Docket Entry ## 1-2, 1-4).  His chief complaint at the May 17, 2012 visit and examination at UMass Memorial Medical Center was swelling in the lower part of his left leg with redness.  (Docket Entry # 1-2).  Plaintiff states he "has blood pooling up under his skin."  (Docket Entry # 1, ¶ 10) (Docket Entry # 33, ¶ 7) (Docket Entry # 1-2).  During the visit, he expressed a concern about cellulitis in his lower left leg.  An ultrasound of the leg on the same day did not show a blood clot.  As a result of the "significant edema," the dosages of plaintiff's diuretic medications were increased.  (Docket Entry # 1-2).

Turning to the grievance process, on July 1, 2012, plaintiff submitted an Inmate Medical Grievance and Appeal Form to the health services unit at OCCC requesting a biopsy, commencement of the process "to obtain a cadaver liver" and "alternative hep c treatment" to eradicate the "cancerous lesion."  (Docket Entry # 1-3).  Riendeau, a registered nurse at OCCC and a member of the health services unit, reviewed the grievance and denied it on July 9, 2012.  (Docket Entry # 1-3) (Docket Entry # 1, ¶¶ 2, 14, 20).  She checked various boxes on the form indicating that the complaint would not be investigated because plaintiff had "not attempted to resolve [the] issue by speaking to Health Services

_____

[6]  DVT is an acronym for deep vein thrombosis.

11

during Management Review Hour" and the issue was not grievable. She also explained that plaintiff's treatment plan was "appropriate" and that plaintiff would be receiving additional testing to "determine if a biopsy is indicated." (Docket Entry # 1-3).

At the bottom of the form there is a box to check if the inmate remains dissatisfied and wished to "appeal to DOC Health Services Division." (Docket Entry # 1-3). The box is not checked.[7]

The medical grievance policy in effect at OCCC in July 2013 and thereafter required an inmate to file an appeal in ten days if dissatisfied with the health service administrator's response. The policy in effect prior to July 2013 is not in the record.

In the fall of 2012, plaintiff filed a complaint ("the nursing complaint") with the Department of Public Health's Division of Health Professions Licensure, Office of Public Protection ("the Registration Board") about Riendeau.[8] (Docket Entry # 1, ¶ 14) (Docket Entry # 1-3). In the nursing complaint, plaintiff states that Riendeau repeatedly cancels doctors'

_____

[7] DOC regulations set out a grievance process for grievances that do not implicate "medical or clinical decisions related to an inmate's physical or mental condition." 103 C.M.R. § 491.08. As stated in these regulations, "the medical contractor is required to maintain its own grievance procedure." 103 C.M.R. § 491.08.

[8] Plaintiff alleges that he "magically" received the November 2012 biopsy after he complained to the Registration Board.

12

orders, including orders for a biopsy and placement on an organ donor list. (Docket Entry # 1-3). The Registration Board decided not to discipline Riendeau.[9] (Docket Entry # 1, ¶ 14).

Shortly after the board's decision, Berg removed all of plaintiff's medications from his cell.[10] (Docket Entry # 1, ¶ 15). Plaintiff had to wait in a medication line to receive his medications three times a day. (Docket Entry # 1, ¶ 15). During management or staff access hours, plaintiff asked Riendeau for the return of his medications. Thereafter, plaintiff received his medications at "the med window." (Docket Entry # 1, ¶ 16). The next day, however, his medications were again taken from his cell. (Docket Entry # 1, ¶ 16). The conduct took place "several

---

[9] On December 31, 2012, plaintiff wrote to the Director of Accreditation, National Commissions on Correctional Health, regarding Riendeau and his need for a liver transplant and alternative treatment for his hepatitis C. (Docket Entry # 1-3).

[10] The complaint alleges that Riendeau retaliated against plaintiff for filing the nursing complaint by ordering Berg, Riendeau's subordinate, to harass plaintiff. (Docket Entry # 1, ¶¶ 15, 17); see fn. 2. There is no indication that plaintiff has personal knowledge of this conversation. Paragraph 15 contains the additional hearsay statement of plaintiff's recital of what Berg told him in the course of removing the medications from his cell. Paragraph 16 contains another hearsay statement that, "Berg asked the block officer to confiscate all plaintiff's meds from his cell." (Docket Entry # 1, ¶ 16). With respect to Berg, the complaint also includes the hearsay statement that, when plaintiff went to the medication "window, he was told that they could not give him any meds because Barbara Berg is in charge of his meds and she won't be back in the institution for another three days." (Docket Entry # 1, ¶ 15). Plaintiff filed a grievance on the matter on February 18, 2013. He appealed the decision to DOC Health Services Division which forwarded the appeal letter to Nickl. (Docket Entry # 1-4).

times." (Docket Entry # 1, ¶ 17).

On December 21, 2012, plaintiff submitted another Inmate Medical Grievance and Appeal Form to the health services unit. Therein, he complained about not receiving Eucerin lotion and another type of lotion for his skin infections. Riendeau denied the grievance on January 2, 2013, because plaintiff had received the Eucerin lotion and the other lotion was "not medically indicated." (Docket Entry # 1-3). By letter dated January 4, 2013, plaintiff appealed the denial to the health services division. In addition to requesting the skin lotion, the appeal letter states, "I need a liver transplant and alternative treatment for hepatitis c (interferon gives me retina problems) . . . I know it is extraordinary that a prisoner get a liver transplant." (Docket Entry # 1-3). By letter dated February 1, 2013, Weiner, the assistant deputy commissioner of clinical services for the DOC, denied the appeal because plaintiff "was provided with a sufficient amount of Eucerin cream to treat [his] medical condition." (Docket Entry # 1-3).

On February 18, 2013, plaintiff submitted a third Inmate Medical Grievance and Appeal Form to the health services unit. Therein, he complained of an inability to obtain his medication because only one of the ten nurses at OCCC, Berg, had the authority to dispense plaintiff's medications. The grievance asked that all of the OCCC nurses be allowed to dispense his medications. (Docket Entry # 1-4). Riendeau denied the

grievance on February 22, 2013, because the issue "has been
resolved and [plaintiff] will obtain [his] medication from the
medication line as discussed." (Docket Entry # 1-4). Plaintiff
checked the appropriate box indicating his desire to appeal the
decision to the DOC health services division.[11] By letter dated
February 27, 2013, plaintiff wrote to the division. The letter,
designated as an appeal, complained about the confiscation of
plaintiff's medications from his cell followed by the return of
the medications and the confiscation of them the next day. The
letter also described the nursing complaint and asserted that
Riendeau was instructing officers to confiscate the medications
and, after the return of the medications, having officers
confiscate the medications again. (Docket Entry # 1-4).

Weiner addressed the appeal in a letter to plaintiff on
March 5, 2013. (Docket Entry # 1, ¶ 17) (Docket Entry # 1-4).
The letter states that Weiner referred the harassment allegations
about Riendeau to Nickl, senior director of program operations
for UMCH. (Docket Entry # 1, ¶ 17) (Docket Entry # 1-4).

As noted above, in July 2013, MPCH replaced UMCH as the
provider of medical services to OCCC inmates. MPCH, which seeks
to dismiss the complaint due to lack of administrative
exhaustion, therefore did not manage the medical grievance
process at OCCC until July 2013. In July 2013, Riendeau left her

_____

[11] On February 22, 2013, plaintiff wrote another letter to the
Registration Board.

position as "HSA"[12] (Docket Entry # 1, ¶ 20) and Davenport took over the position of health services administrator. Davenport and Caratazzola often canceled orders by Nasuti, a nurse practitioner at OCCC, for medications for OCCC inmates. (Docket Entry # 1, ¶ 21).

In July 2013, MPCH adopted a policy that consists of three steps to resolve inmate grievances at OCCC.[13] MPCH policy 12.00, captioned "Clinical Grievance Mechanism," describes the first step as an informal process. During this step, the inmate brings the grievance to the attention of the health services administrator through informal means such as during a management access hour, a sick call visit or a scheduled appointment. (Docket Entry # 33-1, Ex. 2). The second level is a more formal process. At step two, the inmate must use the "Inmate Grievance and Appeal Form." (Docket Entry # 33-1, Ex. 2). The grievance must be addressed to the attention of the Health Service Administrator. The inmate must also complete and submit the form within ten days of the incident or within ten days of the inmate "becoming aware of the incident" or within ten days of the denial of the informal grievance. (Docket Entry # 33-1, Ex. 2).

The final step consists of an appeal to the MPCH Grievance

_____

[12] This court draws the reasonable inference that HSA refers to health services administrator.

[13] The lower left hand side of the policy indicates a July 2013 enactment.

and Appeal Coordinator. Again, the inmate must use the "Inmate Grievance and Appeal Form." He must also file the appeal within ten days of receiving the HSA's decision at the second step. The MPCH Grievance and Appeal Coordinator then generates a decision in 30 days and that decision "is final." (Docket Entry # 33-1, Ex. 1 & 2).

Between July 2013 to July 2014, plaintiff submitted four medical grievances. (Docket Entry # 33-1, Ex. 1). The grievances are as follows: (1) a July 15, 2013 grievance sent to UMCH regarding four unfulfilled requests to release plaintiff's medical records to Prisoners' Legal Services;[14] (2) a July 30, 2013 grievance submitted to the Health Services Administrator regarding the refusal of OCCC medical staff to renew an order for plaintiff's skin lotion;[15] (3) a November 29, 2013 grievance submitted on the Inmate Medical Grievance and Appeal Form to the

---

[14] By letter dated April 13, 2012, Prisoners' Legal Services wrote to then Governor Deval Patrick complaining of the high prevalence of hepatitis C in DOC inmates. The letter points out that the FDA approved two new medications in 2011 which, when combined with ribavirin and peginterferon, purportedly "substantially improves the chances of successful treatment for certain Hepatitis C patients." (Docket Entry # 1-2).

[15] Caratazzola responded to the grievance two days later and advised plaintiff that he could pick up his skin lotion "at the next medication line." (Docket Entry # 33-1, Ex. 4). The response states that, "As I understand your grievance [dated July 30, 2013], you are reporting that you have lost or misplaced your skin lotion bottle." (Docket Entry # 33-1, Ex. 4). The August 1, 2013 response informed plaintiff that, "If [he] did not agree with this grievance response, [he] may pursue an appeal to the MPCH Grievance and Appeal Coordinator." Plaintiff did not appeal Caratazzola's grievance response.

health services unit regarding not having treatment outside the prison for his liver problems as well as the multiple cancellations of appointments; and (4) a May 24, 2014 grievance submitted to the health services unit regarding OCCC staff at the medical window not having his prescribed medications (oxycodone and morphine) that same day.[16] (Docket Entry # 33-1).

The November 29, 2013 grievance recites a series of canceled appointments and, except for an MRI or CAT scan, a lack of medical treatment for eight months. As stated in the grievance, plaintiff advised Caratazzola on multiple occasions about the inability to obtain treatment at medical facilities outside OCCC. On December 18, 2013, Caratazzola, as the health services administrator, responded to the grievance and deemed the final decision "APPROVED."[17] (Docket Entry # 33-1, Ex. 5). The response states that, "A review of your medical record revealed that you were transferred to the U MA Memorial Hospital Liver Clinic for further testing on 12/12/13." (Docket Entry # 33-1, Ex. 5). At the

---

[16] Caratazzola, as the health services administrator, reviewed the grievance and advised plaintiff that the missed morning dose of medication was "due to our error." (Docket Entry # 33-1, Ex. 6). Caratazolla's response deemed the final decision "APPROVED." (Docket Entry # 33-1, Ex. 6). At the bottom of the response is the statement that, "An appeal must be filled out in 10 working days from receipt of the decision by the HSA or designee" and that an inmate "may file an appeal directly with the MPCH Grievance and Appeal Coordinator . . .." (Docket Entry # 33-1, Ex. 6). Plaintiff did not appeal the decision. (Docket Entry # 33-1).

[17] Plaintiff argues that he cannot appeal an "approved" grievance under Massachusetts law. (Docket Entry # 40).

bottom of the response appears the same statement that, "An appeal must be filled out in 10 working days from receipt of the decision by the HSA or designee" and that an inmate "may file an appeal directly with the MPCH Grievance and Appeal Coordinator . . .." (Docket Entry # 33-1, Ex. 5). Plaintiff did not appeal Caratazolla's response. (Docket Entry # 33-1).

In July 2014, plaintiff complained about the door to his handicapped cell not staying shut to allow him to dress his skin infections in private. The grievance was forwarded to the Institutional Grievance Coordinator or his designee and "partially approved" on July 17, 2014. (Docket Entry # 40-5). The July 17, 2014 decision states, "Denied grievances may be appealed to the Superintendent within 10 working days of the Institutional Grievance Coordinator's decision."[18] (Docket Entry # 40-5). Plaintiff did not appeal the decision.

On April 14, 2014, the Director of Clinical Services of DOC health services division's wrote to plaintiff. The letter notes receipt of plaintiff's February 27, 2014 letter to the

_____

[18] Because the grievance did not involve medical decisions, the DOC grievance regulations applied. These regulations allow an inmate to file an appeal of the Institutional Grievance Coordinator's decision to the Superintendent of OCCC. See 103 C.M.R. § 491.12 ("[a]n inmate whose grievance has been denied may appeal to the Superintendent"). Subject to exceptions, the inmate must file the appeal to the Superintendent within ten days of the date of the decision. See 103 C.M.R. § 491.12 ("[t]he appeal must be filed within ten working days from receipt of a decision to the Superintendent").

Commissioner of Insurance.[19]  The April 14, 2014 letter reads as follows:

> According to information documented by MPCH, you were receiving Hep C treatment, but it appears that you developed cotton wool spots and treatment had to be stopped at that time.  MPCH reported the spots are caused by Peg Intron treatment and it could cause blindness if the treatment is not stopped.  MPCH does not have an alternative treatment plan that does not include the Peg Intron at this time.  However, they are working on obtaining newer treatments that were recently approved by the FDA.

(Docket Entry # 40-2).[20]

Notably, on January 5, 2015, plaintiff filed a grievance requesting that he receive the new drug[s] for his hepatitis C.  Caratazzola, the health service administrator, denied the grievance on the same day.[21]  Caratazzola's decision notes that, "An appeal must be filled out within ten working days from receipt" and provided the address for filing an appeal.  (Docket Entry # 57).  Plaintiff complied with the instruction and filed a timely appeal with the Grievance Appeals Coordinator.  On January

---

[19]  With respect to plaintiff's letter, there is no evidence that plaintiff adhered to MPCH's grievance policy by complying with the first and second steps.

[20]  None of the statements in the April 14, 2014 letter are considered for the truth of the matter asserted.

[21]  The original grievance is not in the record.  On the appeal form, there is a summary of what plaintiff stated in the original grievance including a recital of what plaintiff said to Caratazzola on January 2, 2015.  Because the statements constitute hearsay, there is no indication that plaintiff made an informal complaint of speaking to the health services administrator.

30, 2015, the Grievance Appeals Coordinator denied the appeal.
The decisions reads as follows:

> Based on your request for the "newly approved hepatitis C
> drugs immediately," your request cannot be granted.  I was
> informed by the ID nurse [that] the treatment plan developed
> to treat the hepatitis C is in progress.  You are encouraged
> to reach out to your medical team for updates on your
> treatment plan.  I have included a copy of the MPCH grievance
> and appeal form.  Please utilize this form when submitting
> future appeals.

(Docket Entry # 57).

## DISCUSSION

The MPCH defendants seek summary judgment because:  (1)
plaintiff has not exhausted his administrative remedies; (2) the
section 1983 claim fails "because plaintiff is not entitled to the
treatment of his choice" and "a dispute over the best course of
treatment is not actionable"; and (3) plaintiff admits he does not
have a claim against Nasuti and the facts fail to evidence that
she "'intended wantonly to inflict pain'" in violation of the
Eighth Amendment.  (Docket Entry ## 32, 33).

In response to the first argument, plaintiff argues that
Massachusetts law does not allow an appeal of an approved or
partially approved grievance.  (Docket Entry # 40).  He also
contends that the July 2012 grievance and/or the January 4, 2013
appeal letter satisfied any exhaustion requirement.  Plaintiff
further argues that exhaustion is not required under state law
because he falls under a statutory exception that excuses

exhaustion for serious medical conditions.  See Mass. Gen. L. ch. 127, § 38E.

With respect to both the second and third arguments, the MPCH defendants limit their discussion to the section 1983 claim and the lack of deliberate indifference under the Eighth Amendment. The arguments do not cite state law or refer to the state law claims in this case.  Instead, the arguments cite cases involving section 1983 claims and liability under the deliberate indifference standard under the Eighth Amendment.  Any argument seeking summary judgment on the state law claims is therefore waived as a basis for summary judgment with respect to the present motion.  See Coons v. Industrial Knife Co., Inc., 620 F.3d 38, 44 (1st Cir. 2010) ("district court was 'free to disregard' the state law argument that was not developed in Coons's brief"); see also O'Connell v. Marrero-Recio, 724 F.3d 117, 124 (1st Cir. 2013) (district court "had no reason to factor into its analysis of O'Connell's retaliation claim the allegations concerning her participation in the NPP's primary elections" because O'Connell's brief did not premise the claim on this allegation); Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d 252, 260 (1st Cir. 1999) ("district court is free to disregard arguments that are not adequately developed").

A.  Exhaustion

The PLRA imposes a mandatory exhaustion requirement on all prisoners seeking to file a section 1983 claim challenging prison

conditions in federal court.  42 U.S.C. § 1997(a).  The statute

provides:

> No action shall be brought with respect to prison conditions
> under section 1983 of this title, or any other Federal law,
> by a prisoner confined in any jail, prison, or other
> correctional facility until such administrative remedies as
> are available are exhausted.

42 U.S.C. § 1997e(a).  The requirement to exhaust administrative

exhaustion is mandatory.  Jones v. Bock, 549 U.S. 199, 211 (2007)

("[t]ere is no question that exhaustion is mandatory under the

PLRA").  As an affirmative defense, the MPCH defendants bear the

underlying burden at trial to prove exhaustion.  See Cruz Berrios

v. Gonzalez-Rosario, 630 F.3d 7, 11 (1st Cir. 2010) (exhaustion

under PLRA "must be raised and proved by the defense"); Ramos v.

Patnaude, 640 F.3d 485, 488 (1st Cir. 2011) (exhaustion is not "a

jurisdictional condition").

The plain language of the PLRA instructs that "[a]ll

'available' remedies must now be exhausted."  Porter v. Nussle,

534 U.S. 516, 524 (2002).  A remedy remains "available" even

though it is not the form of relief sought by the inmate as long

as prison authorities have the authority to take some action in

response to the inmate's grievance.  See Booth v. Churner, 532

U.S. 731, 736 & n.4 (2001) (administrative remedies remain

"available" as long as grievance system has authority to take some

responsive action with respect to the type of allegations the

inmate raises).  The decision in Booth holds that, "[A]n inmate

must exhaust irrespective of the forms of relief sought and

23

offered through administrative avenues." Booth v. Churner, 532
U.S. at 741 n.6.

Plaintiff's argument that he was not required to exhaust
grievances "approved" or "partially approved" by the Health
Service Administrator at the second level (Docket Entry # 40, p.
9) (Docket Entry ## 40-4, 40-5) is therefore misguided. Here,
notwithstanding the approval or partial approval, plaintiff still
had the available remedy of an appeal to the MPCH Grievance and
Appeal Coordinator with respect to the November 2013 medical
grievance (Docket Entry # 40-4) and to the Superintendent at OCCC
with respect to the July 2014 non-medical grievance (Docket Entry
# 40-5). The fact that plaintiff received relief at the second
level does not preclude the appeal to the third level. See Booth
v. Churner, 532 U.S. at 739-741 (upholding dismissal of complaint
for failure to exhaust because inmate did not appeal decision to
grant partial relief (a transfer) and to deny other relief (money
damages)); Johnson v. Thynq, 2010 WL 965259, at *3-4 (1st Cir.
March 18, 2010) (inmate failed to exhaust by not filing appeal
even though appeal was discretionary as opposed to mandatory).[22]

Plaintiff's reliance on Jackson v. Verdini, 2005 WL 1457748,
at *4 (Mass.Super. June 9, 2005) (because inmate "had no right to
appeal a grievance that was granted, Jackson had exhausted the

---

[22] Although unpublished opinions are not considered binding
precedent, Fed.R.App.Pro. 32.1 allows citations of unpublished
opinions issued on or after January 1, 2007. See also First
Circuit Rule 32.1.0.

grievance procedure made available to him by DOC"), is misguided.
The grievance process at issue in <u>Jackson</u> was the process
prescribed under the DOC regulations and therefore did not apply
to the "approved" medical grievance in this case regarding access
to outside medical facilities (Docket Entry # 40-4).  As noted
below, it is the medical grievance process at OCCC that controls.
<u>See</u> <u>Jones v. Bock</u>, 549 U.S. at 218 (prison's requirements define
exhaustion).  Here, the policy applicable to the medical grievance
unequivocally allowed an appeal "only after *dissatisfaction* with a
response to a formal grievance."  (Docket Entry # 33-1) (emphasis
added).[23]  Under the policy, the appeal is filed "within 10 working
days from receipt of *the decision* by the HSA or designee."
(Docket Entry # 33-1) (emphasis added).  The form likewise states
that the appeal is filed ten days "from receipt of *the decision* by
the HSA or his designee."  (Docket Entry # 40-5) (emphasis added).
The plain language of the policy thus allows an appeal of "the
decision" as opposed to only a "decision denying the claim."
Further, the policy allows an appeal based on the inmate's
dissatisfaction as opposed to the result of the decision as
approved or denied.  Accordingly, the terms of the policy do not

---

[23]  The same standard of inmate satisfaction applies to filing an
appeal to the second level.  (Docket Entry # 33-1) ("If the
inmate-patient is not satisfied with the response, the inmate-
patient will be given instructions on how to file a formal
grievance").

foreclose an appeal if the Health Service Administrator approved the grievance at the second level.

As to the non-medical grievance, it was "partial[ly] approv[ed]" (Docket Entry # 40-5) as opposed to "granted" in full as in Jackson. See Booth v. Churner, 532 U.S. at 739-741. More importantly, the grievance pertains to an issue that is not material to the case at bar, namely, the ability to close plaintiff's door to his handicapped cell. Finally, with respect to both the foregoing medical grievance and the non-medical grievance, the Jackson court's brevis statement cited no case law. Plaintiff's argument that he was not required to exhaust grievances approved or partially approved by the Health Service Administrator at the second level (Docket Entry # 40, p. 9) (Docket Entry ## 40-4, 40-5) does not provide a basis to avoid summary judgment.

Turning to the January 2015 grievance, it is well settled that it is "the prison's requirements . . . that define the boundaries of proper exhaustion." Jones v. Bock, 549 U.S. at 218. In order "to properly exhaust administrative remedies prisoners must 'complete the administrative review process in accordance with the applicable procedural rules.'" Jones v. Bock, 549 U.S. at 218 (quoting the holding in Woodford v. Ngo, 548 U.S. 81, 88 (2006)). Where, as here, the grievance process imposes deadlines to file an initial claim or an appeal, the inmate must comply with those procedures. See Woodford v. Ngo, 548 U.S. at 90-95; Acosta

v. U.S. Marshals Service, 445 F.3d 509, 512 (1st Cir. 2006) (quoting Seventh Circuit case in parenthetical that "'prisoner must file complaints and appeals in the place, and at the time, the prison's administrative rules require'"); Facey v. Dickhaut, 892 F.Supp.2d 347, 352 (D.Mass. 2012) ("exhaustion requires compliance with the procedural requirements of all levels of administrative review").  After all, "[p]roper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." Woodford v. Ngo, 548 U.S. at 90-91 (dicta).

With respect to the January 2015 grievance, there is no evidence, other than hearsay, that plaintiff complied with the first step in the grievance process.  Nevertheless, Caratazzola considered the appeal as did the Grievance Appeals Coordinator.

Examining the purpose behind the exhaustion requirement provides guidance regarding whether the January 2015 grievance and appeal constitute exhaustion as to the MPCH defendants.  See Johnson v. Johnson, 385 F.3d 503, 519-522 (5th Cir. 2004).  The benefits of exhaustion include "allowing a prison to address complaints about the program it administers before being subjected to suit, reducing litigation to the extent complaints are satisfactorily resolved, and improving litigation that does occur by leading to the preparation of a useful record." Jones v. Bock, 549 U.S. at 219; see Porter v. Nussle, 534 U.S. at 524-525.

Notice to the entity or individuals sued, i.e., the MPCH defendants, is not one of the primary purposes of the exhaustion requirement.  See Jones v. Bock, 549 U.S. at 219.  Hence, the fact that the January 2015 grievance, if any, or the appeal might not have named any of the MPCH defendants, particularly where the standard form simply asks for a brief description of the medical complaint (Docket Entry # 1-3), does not preclude exhaustion.  See Maddox v. Love, 655 F.3d 709, 722 (7th Cir. 2011) ("the form provided by the prison didn't request inmates to provide the name of the person subject to the complaint"); see generally Jones v. Bock, 549 U.S. at 217 ("PLRA requires exhaustion of 'such administrative remedies as are available,' 42 U.S.C. § 1997e(a), but nothing in the statute imposes a 'name all defendants' requirement").

First and foremost, a "grievance must provide administrators with a fair opportunity under the circumstances to address the problem that will later form the basis of the suit."  Johnson v. Johnson, 385 F.3d at 522 (examining whether inmate exhausted administrative remedies with regard to certain defendants and to certain incidents); see Woodford v. Ngo, 548 U.S. at 93–94 (PLRA "seeks to 'afford corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case'") (internal brackets omitted).  Indeed, "[t]he benefits of exhaustion can be realized only if the prison

28

grievance system is given a fair opportunity to consider the grievance." <u>Woodford v. Ngo</u>, 548 U.S. at 95.

Here, by virtue of the January 2015 grievance and appeal, the MPH defendants had the opportunity to address the matter before being subjected to suit. The recent resolution of the January 2015 grievance makes it unlikely that another grievance will result in a satisfactory resolution or lead to a more detailed record. In light of the above, it remains a genuine issue of material fact whether the January 2015 grievance and appeal satisfied the PLRA's exhaustion requirement. Accordingly, the MPCH defendants are not entitled to summary judgment with respect to the section 1983 claim due to any lack of exhaustion under the PLRA.[24]

The MPCH defendants next argue that the state law claims under the Massachusetts Declaration of Rights and the MTCA are barred under Massachusetts General Laws chapter 127, section 38F ("section 38F"). Section 38F states that, "An inmate shall not file any claim that may be the subject of a grievance under section 38E unless the inmate has exhausted the administrative remedy established pursuant to said section 38E." Mass. Gen. Laws ch. 127, § 38F. Plaintiff maintains that he falls under the statute's exception for "exigent circumstances." (Docket Entry #

_____

[24] It is therefore not necessary to address whether the July 2012 grievance, the January 2013 appeal letter or the other grievances in the record satisfy the PLRA.

40).  This provision allows the court to consider a claim
notwithstanding the failure to exhaust "if the inmate can
demonstrate to the court that exigent circumstances exist which,
if delayed pursuant to the requirements of this section, would
jeopardize the life or seriously impair the health of the inmate,
or, for actions seeking equitable relief."  Mass. Gen. Laws ch.
127, § 38F.

Plaintiff's medical condition includes "advanced cirrhosis"
and "chronic hepatitis C."  (Docket Entry # 1-2).  He is "weak"
and in a wheelchair.  (Docket Entry # 1, ¶¶ 10, 18).  Whereas the
medical record shows that the lesion in his liver is ablated,
plaintiff's liver condition and health creates a material issue of
fact as to whether he falls within the exigent circumstances
exception.  See, e.g., Reaves v. Correctional Medical Services,
2005 WL 2439195, at *5 (Mass.Super. Sept. 16, 2005) ("dramatic
decline" in inmate's "health since entering DOC custody" created
exigent circumstances under section 38F and allowed him "to pursue
his state claims" notwithstanding failure to exhaust).
Accordingly, the MPCH defendants are not entitled to summary
judgment based on exhaustion with respect to the state law claims.

B.  Section 1983

The MPCH defendants next seek summary judgment on the section
1983 claim because plaintiff is not entitled to the treatment of
his choice and any disagreement with the course of medical

treatment does not amount to deliberate indifference under the Eighth Amendment.[25]  (Docket Entry # 33).

In order to succeed in an Eighth Amendment claim based on denied or inadequate medical care, a prisoner must satisfy:  "(1) an objective prong that requires proof of a serious medical need, and (2) a subjective prong that mandates a showing of prison administrators' deliberate indifference to that need."  <u>Kosilek v. Spencer</u>, 774 F.3d 63, 82 (1st Cir. 2014);  <u>Leavitt v. Correctional Medical Services, Inc.</u>, 645 F.3d 484, 497 (1st Cir. 2011).  The MPCH defendants seek summary judgment on the second, deliberate indifference prong.

"Deliberate indifference means that 'a prison official subjectively "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."'"  <u>Ruiz-Rosa v. Rullan</u>, 485 F.3d at 156; <u>Farmer v. Brennan</u>, 511 U.S. 825, 837 (1994).  Negligent care or "even malpractice does not give rise to a constitutional claim; rather, the treatment provided must have been so inadequate as 'to constitute "an unnecessary and wanton infliction of pain" or to be "repugnant to the conscience of mankind."'"  <u>Leavitt v. Correctional Medical Services, Inc.</u>, 645 F.3d 484, 497 (1st Cir. 2011) (quoting <u>Estelle v. Gamble</u>, 429 U.S. 97, 105-106 (1976)) (citation omitted); <u>see also</u> <u>Kosilek v. Spencer</u>, 774 F.3d at 87

_____

[25]  As previously explained, the argument does not address the state law claims and expressly references only section 1983.

31

("medical imprudence—without more—is insufficient to establish an Eighth Amendment violation").

A "wanton disregard" to a prisoner's needs requires a disregard "akin to criminal recklessness, requiring consciousness of '"impending harm, easily preventable."'"  Kosilek v. Spencer, 774 F.3d at 83 (quoting Watson v. Caton, 984 F.2d 537, 540 (1st Cir. 1993)).  "[A] deliberate intent to harm is not required," however, because it is enough "to show a wanton disregard sufficiently evidenced 'by denial, delay, or interference with prescribed health care.'"  Battista v. Clarke, 645 F.3d 449, 453 (1st Cir. 2011) (quoting DesRosiers v. Moran, 949 F.2d 15, 19 (1st Cir. 1991)).

A prison official is not deliberately indifferent if he responds "reasonably to the risk."  Burrell v. Hampshire County, 307 F.3d 1, 7 (1st Cir. 2002).  A disagreement about an appropriate course of treatment therefore does not amount to deliberate indifference.  See Feeney v. Correctional Medical Services, Inc., 464 F.3d 158, 162 (1st Cir. 2006) ("when a plaintiff's 'allegations simply reflect a disagreement on the appropriate course of treatment, such a dispute with an exercise of professional judgment may present a colorable claim of negligence, but it falls short of alleging a constitutional violation'") (internal brackets omitted).  Hence, courts consistently refuse "'to create constitutional claims out of disagreements between prisoners and doctors about the proper course of a prisoner's medical treatment,

or to conclude that simple medical malpractice rises to the level of cruel and unusual punishment.'" <u>Kosilek v. Spencer</u>, 774 F.3d at 83 (quoting <u>Watson v. Caton</u>, 984 F.2d at 540, in parenthetical). Conversely, deliberate indifference may exist "'by the denial of needed care as punishment and by decisions about medical care made recklessly with "actual knowledge of impending harm, easily preventable."'" <u>Leavitt v. Correctional Medical Services, Inc.</u>, 645 F.3d at 497 (quoting <u>Ruiz-Rosa</u>, 485 F.3d at 156).

Here, it is evident that plaintiff disagreed with the failure to treat his hepatitis C with Boceprevir and Telaprevir. The failure to provide these medications was nevertheless reasonable. Plaintiff has a diagnosed viral mutation that predicts resistence to both these medications. An attending physician at Boston Medical Center therefore recommended against treating plaintiff with protease inhibitors. During the past year, medical personnel have actively monitored his hepatitis C with lab tests and consultations. After the FDA approved a new medication in October 2014, plaintiff underwent a medical exam at Lemuel Shattuck Hospital in January 2015 to discuss the new treatment. Furthermore, after the FDA approval, MPCH personnel responded and approved plaintiff for treatment with Harvoni. Plaintiff is scheduled to begin the treatment in early March 2015. Considering the entire treatment MPCH afforded to plaintiff beginning in July 2013, such conduct fails to evidence a deliberate indifference to

plaintiff's hepatitis C or any denied or delayed care as a punishment. Inasmuch as he is receiving appropriate care, albeit not the drug regimen of Boceprevir and Telaprevir that he sought for a number of years, and the delay was reasonable in light of plaintiff's viral mutation, the MPCH defendants are entitled to summary judgment on the Eighth Amendment claim.[26]

II. UMCH's MOTION TO DISMISS

UMCH argues that, as an agency of the Commonwealth of Massachusetts, it is entitled to sovereign immunity under the Eleventh Amendment. UMCH moves to dismiss the complaint under Rule 12(b)(1) for lack of subject matter jurisdiction.

STANDARD OF REVIEW

When a district court considers a Rule 12(b)(1) motion, it must credit the plaintiff's well-pled factual allegations and draw all reasonable inferences in the plaintiff's favor. Merlonghi v. U.S., 620 F.3d 50, 54 (1st Cir. 2010) (citing Valentin v. Hospital Bella Vista, 254 F.3d 358, 363 (1st Cir. 2001)); Sanchez ex rel. D.R.-S. v. U.S., 671 F.3d 86, 92 (1st Cir. 2012) ("credit[ing] the plaintiff's well-pled factual allegations and draw[ing] all reasonable inferences in the plaintiff's favor" under Rule 12(b)(1)). "The district court may also 'consider whatever evidence has been submitted, such as the depositions and exhibits

---

[26] It is therefore not necessary to address the MPCH defendants' third argument regarding plaintiff's admission.

submitted.'" Merlonghi v. U.S., 620 F.3d at 54 (quoting Aversa v. United States, 99 F.3d 1200, 1210 (1st Cir. 1996)). Subjective characterizations, unsupported conclusions or interpretations of the law will not defeat a Rule 12(b)(1) motion. Murphy v. United States, 45 F.3d 520, 522 (1st Cir. 1995). Where, as here, a defendant challenges subject matter jurisdiction, the plaintiff bears the burden of proving jurisdiction. Johansen v. U.S., 506 F.3d 65, 68 (1st Cir. 2007). Finally, "'Federal courts are courts of limited jurisdiction'" and "[t]he existence of subject-matter jurisdiction is 'never presumed.'" Fafel v. Dipaola, 399 F.3d 403, 410 (1st Cir. 2005) (quoting Kokkonen v. Guardian Life Insurance Co. of America, 511 U.S. 375, 377 (1994), and Viqueira v. First Bank, 140 F.3d 12, 16 (1st Cir. 1998)).

FACTUAL BACKGROUND

Having previously described the facts set forth in the verified complaint and the attached documents, they need not be repeated.[27]  Prior to July 2013, UMCH provided medical services to OCCC inmates under a contract with the DOC.  UMCH is not a separately incorporated entity.  Rather, it is a business name used by Commonwealth Medicine.  Commonwealth Medicine is a department of the University of Massachusetts Medical School ("UMMS").  UMMS is one of five campuses that comprise the University of Massachusetts educational system.

---

[27]  The additional facts set out in this section are culled from Nickl's affidavit.

Individuals who worked for UMCH and provided medical services to OCCC inmates were employees of UMMS. UMMS employees therefore managed the medical care and services provided by UMCH. They received employment benefits from UMMS. UMMS approved any contract that named or referred to UMCH. UMMS thus approved the contract between UMCH and the DOC. UMCH does "not have any sources of funding independent of [UMMS]." (Docket Entry # 27-1). Any money generated by UMCH is "deposited in the general treasury of the University of Massachusetts and controlled by a central Treasurer for the entire University of Massachusetts system." (Docket Entry # 27-1). In the event a judgment entered in this action, the Commonwealth of Massachusetts or its insurer would satisfy any monetary recovery.

DISCUSSION

The Eleventh Amendment bars a federal court suit against a State without its consent. U.S. Const. Amend. XI; <u>Will v. Michigan Dept. of State Police</u>, 491 U.S. 58, 66 (1989). A state is not subject to suit under section 1983 because a state is not a "person" within the meaning of this statute. <u>Will v. Michigan Dept. Of State Police</u>, 491 U.S. at 71. A suit against an individual in his or her official capacity, moreover, imposes liability on the state he or she represents and is therefore also barred. <u>Id.</u>; <u>Kentucky v. Graham</u>, 473 U.S. 159, 166 (1985). On the other hand, the Eleventh Amendment does not bar a suit against an individual in his individual capacity. <u>See Dasey v. Anderson</u>,

304 F.3d 148, 153 (1st Cir. 2002) ("[b]ecause Dasey's amended complaint dropped the MSP as a defendant, and names the remaining defendants only in their individual capacities, neither the Eleventh Amendment nor principles of sovereign immunity present any obstacles to Dasey's claims"); J. Lopez Hernandez v. Fajardo Velez, 2002 WL 731757 at * 4 (D.P.R. April 25, 2002) ("although Eleventh Amendment precludes suit against defendants in their official capacity, it does not preclude recovery of damages against defendants in their "personal or individual capacity"). Hence, a dismissal of UMCH does not encompass the individual capacity claims against Riendeau, Nickl or Weiner.

Immunity under the Eleventh Amendment "extends to any entity that is an 'arm of the state.'" Wojcik v. Mass. State Lottery Commission, 300 F.3d 92, 99 (1st Cir. 2002) (quoting In re San Juan Dupont Plaza Hotel Fire Litigation, 888 F.2d 940, 942 (1st Cir. 1989)). The analysis, as reframed in Fresenius Medical Care Cardiovascular Res., Inc. v. Puerto Rico, 322 F.3d 56, 61 (1st Cir. 2003), in light of Hess v. Port Auth. Trans-Hudson Corp., 513 U.S. 30 (1994), initially assesses "'whether the state has indicated an intention-either explicitly by statute or implicitly through the structure of the entity-that the entity share the state's sovereign immunity.'" Irizarry-Mora v. University of Puerto Rico, 647 F.3d 9, 14 (1st Cir. 2011) (quoting Redondo Construction Corp. v. P.R. Highway & Transportation Authority, 357 F.3d 124, 126 (1st Cir. 2004)). Where, as here, no explicit indication exists that UMCH share the Commonwealth's sovereign immunity, the inquiry

reduces to two parts.  _Id._  First, the court considers

"'structural indicators of the state's intention.'"  _Id._ (quoting

_Redondo_, 357 F.3d at 126).  Second, if the structural indicators

"'point in different directions, the court must proceed to the

second stage and consider whether the state's treasury would be at

risk in the event of an adverse judgment.'"  _Id._ (quoting _Redondo_,

357 F.3d at 126).  Simply stated, the court examines "the

structural prong and, if necessary, the impact-on-the-treasury

prong."  _Id._  Both prongs entail consideration of various factors.

_Id._ at 12-13 & n.3.

Turning to the task, the structural prong includes

considerations of:

> "(1) [the] extent of state control including through the
> appointment of board members and the state's power to veto
> board actions or enlarge the entity's responsibilities; (2)
> how the enabling and implementing legislation characterized
> the entity and how the state courts have viewed the entity;
> (3) whether the entity's functions are readily classifiable
> as state functions or local or non-governmental functions;
> and (4) whether the state bore legal liability for the
> entity's debts."

_Id._ at 13 n.3 (quoting _Fresenius_, 322 F.3d at 65 n.7).  The first

consideration lends support for extending immunity to UMMS and its

department, Commonwealth Medicine, which does business under the

UMCH name.

Overall, the University of Massachusetts ("UMass") is a

"public institution of higher learning within the system of public

higher education" that is governed by a board of trustees.  Mass.

Gen. Laws ch. 75, § 1.  The 19 member board consists of 16 members

38

appointed by the governor, two non-voting student members and the secretary of education for the Commonwealth. Mass. Gen. Laws ch. 75, § 1A. The governor's appointment power and control over the board supports a finding that UMass, and its five campuses including UMMS, is an arm of the state. See Irizarry-Mora v. University of Puerto Rico, 647 F.3d at 15 & n.9 ("[i]n further support of the proposition that the University is an arm of the Commonwealth, we note that ten of the thirteen members of its governing board are appointed by the governor").

The Massachusetts legislature appropriates the funds for UMass which the Trustees administer. McGee v. UMass Correctional Health, 2010 WL 3464282, at *2 (D.Mass. Sept. 1, 2010); Mass. Gen. Laws ch. 75, § 8. The Trustees must submit budgets in the form and the manner required by the Governor, the Secretary of Education and the legislature. Mass. Gen. L. ch. 75, § 7. The Secretary of Education prepares and submits a comprehensive budget for the public higher education system for use by the Secretary of Administration and Finance and legislative committees. McGee v. UMass Correctional Health, 2010 WL 3464282, at *2; Mass. Gen. Laws ch. 15A, § 15B; Mass. Gen. L. ch. 75, § 1A. The Trustees must also prepare an annual financial report for the Governor and the legislature that covers all receipts and expenditures. Mass. Gen. L. ch. 75, § 10. The Trustees also submit monthly statements of receipts and expenditures to the state controller. Mass. Gen. L. ch. 75, § 10. Their purchasing power is limited to a set ceiling

by statute.  Mass. Gen. L. ch. 75, § 13.  This level of oversight and control evidences an intention to extend the state's immunity to the public universities in the UMass system.  <u>See</u> <u>Irizarry-Mora v. University of Puerto Rico</u>, 647 F.3d at 15.

More specifically with respect to UMMS, the trustees are authorized to "maintain a medical school to be known as the University of Massachusetts Medical School."  Mass. Gen. Laws ch. 75, § 34 ("section 34").  The Trustees have the authority to accept grants or matching funds from state and federal agencies to finance, improve or expand the school.  Mass. Gen. Laws ch. 75, § 34.  The Trustees also elect the dean and other officers of UMMS, fix their classifications and salaries within the confines of a general salary schedule, and "define the duties and tenure" for all UMMS officers and professional staff members.  Mass. Gen. Laws ch. 75, § 35.  Although the Trustees exercise a degree of autonomy over the operations of UMMS, they remain individuals appointed by the Governor.  <u>See</u> <u>Irizarry-Mora v. University of Puerto Rico</u>, 647 F.3d at 15-14 & n.9 (it "remains structurally significant" that "University's governing authority resides primarily in individuals appointed by the governor").  Furthermore, the Trustees lack the power to purchase an interest in real property for UMMS unless the Secretary of Administration and Finance first approves the transaction.  Mass. Gen. Laws ch. 75, § 36C.

The state's oversight and control of UMass inevitably extends to UMCH.  UMCH is not an entity separate from Commonwealth

Medicine.  Commonwealth Medicine is a department of UMMS.  UMMS

employees manage UMCH.  UMCH gets its funding from UMMS.  Any

individual who provides services on behalf of UMCH is an employee

of UMMS.  (Docket Entry # 27-1).

With respect to the second structural consideration,

Massachusetts state courts view UMMS as "an agency of the State."

McNamara v. Honeyman, 546 N.E.2d 139, 142 (Mass. 1989); accord

Chapman v. University of Massachusetts Medical Center, 670 N.E.2d

166, 167 (Mass. 1996); U.S. v. University of Massachusetts,

Worcester, 2015 WL 260530, at *2 (D.Mass. Jan. 21, 2015).  State

courts consider UMMS and UMCH, which UMMS manages and controls

(Docket Entry # 27-1), as an arm of the state.  See, e.g., McGee

v. UMass Correctional Health, 2010 WL 3464282, at *4 (finding

"that UMCH, as a program completely encapsulated within UMMS and

UMass, is an arm of the state for purposes of determining Eleventh

Amendment immunity"); Juandoo v. UMCH, 690 F.Supp.2d 20, 29

(D.Mass. 2003).  Implementing legislation for the state's higher

education institutions, which encompass UMMS, declares an

overarching policy of providing high quality institutions of

public higher education that serve the "needs of the commonwealth

and its citizens."  Mass. Gen. Laws ch. 75, § 36C; see generally

Irizarry-Mora v. University of Puerto Rico, 647 F.3d at 14 (state

universities typically play a "distinctive, public-oriented role"

in a "state's higher education landscape").

Massachusetts also indemnifies the Trustees against loss and liability for damages. Mass. Gen. Laws ch. 75, § 1A. Monies received by UMCH are deposited into the treasury of UMass "and controlled by a central Treasurer for the" entire UMass system. (Docket Entry # 27-1). "UMMS 'has no authority to issue bonds'" and cannot "'sue or be sued in its own name.'" U.S. v. University of Massachusetts, Worcester, 2015 WL 260530, at *2 (quoting McNamara v. Honeyman, 546 N.E.2d at 142). The fourth consideration thus supports a finding that the state's immunity extends to UMMS and, in turn, UMCH.

Accordingly, the structural considerations point primarily in one direction, namely, that UMCH is an arm of the state and entitled to Eleventh Amendment immunity. To the extent there is any doubt, the fiscal relationship between the state on the one hand and UMMS and its departments, including Commonwealth Medicine, on the other hand confirm that Eleventh Amendment immunity applies. Fiscal considerations examine the impact on the state's treasury in the event of an adverse judgment. Irizarry-Mora v. University of Puerto Rico, 647 F.3d at 12. These considerations include:

> "whether the state laws impose an obligation on the state to be responsible for payment of judgments against the entity (on this point federal courts are not free to assume that a state will voluntarily assume the payment of the entity's debts if the entity is in need); other sources of revenue for the entity; and whether the agency is so structured that, as a practical matter, the state anticipated budget shortfalls that would render the entity constantly dependent on the state."

42

Id. at 13 n.3 (quoting Fresenius, 322 F.3d at 65 n.8).

Here, the legislature funds and appropriates the money to maintain, operate and support UMass and its five campuses, including UMMS. Mass. Gen. Laws ch. 75, §§ 1, 8; see Irizarry-Mora v. University of Puerto Rico, 647 F.3d at 16 (noting that Commonwealth of Puerto Rico "provides the bulk of the funding" for the University's operations in addressing the treasury prong). UMCH does not have any funding independent of UMMS. (Docket Entry # 27-1). Notably, "Any judgment that might enter against UMCH in this case would be satisfied by the Commonwealth of Massachusetts or by insurance purchased by [UMass] for the purposes of satisfying judgments against the state." (Docket Entry # 27-1). Indeed, the strikingly similar finding made by the court in U.S. v. University of Massachusetts, Worcester, 2015 WL 260530, at *2, warranted Eleventh Amendment immunity for UMCH under "the second part of the 'arm of the state' analysis." Id. Allocating any portion of UMass funds to pay court judgments reduces the availability of such funds for the UMass system and negatively impacts the ability of UMass to comply with the statutory policy of fostering and supporting "institutions of public education that are of the highest quality." Mass. Gen. L. ch. 15A, § 1; Irizarry-Mora v. University of Puerto Rico, 647 F.3d at 17 (allocating "University's general fund revenues to court judgments" dilutes "impact of the public funds the UPR receives" and diminishes "University's ability to

comply with its statutory mission to provide "good quality higher education" for Puerto Rico's residents).

In sum, the Commonwealth's Eleventh Amendment immunity extends to UMCH.  The immunity precludes the section 1983 claim against UMCH as well as the state law claims against UMCH brought in federal court.  See Caisse v. DuBois, 346 F.3d 213, 218 (1st Cir. 2003) ("[b]y enacting the Massachusetts Tort Claims Act, the Commonwealth has not waived its Eleventh Amendment immunity to suit in federal court").  Although immunity does not extend to injunctive relief, UMCH is no longer providing medical services to OCCC inmates.

<u>CONCLUSION</u>

In accordance with the foregoing discussion, this court **RECOMMENDS**[28] that UMCH's motion to dismiss (Docket Entry # 26) be **ALLOWED**.  This court further **RECOMMENDS**[29] that the MPCH defendants' motion for summary judgment (Docket Entry # 32) be **ALLOWED** as to the section 1983 Eighth Amendment claim and that the motion otherwise be **DENIED**.

   /s/ Marianne B. Bowler
**MARIANNE B. BOWLER**
United States Magistrate Judge

---

[28] Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days of receipt of the Report and Recommendation to which objection is made and the basis for such objection.  Any party may respond to another party's objections within 14 days after service of the objections. Failure to file objections within the specified time waives the right to appeal the order.

[29] See the previous footnote.