UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DANA LOPES,
    Plaintiff,

    v.                                     CIVIL ACTION NO.
                                                 14-10679-NMG

GERALDINE RIENDEAU, R.N., BARBARA BERG,
LPN, UMASS CORRECTIONAL HEALTH, Program
Services, DYANA NICKL, Senior Director
of Program UMass Corr. Health, LAWRENCE
WEINER, Assistant Deputy Commissioner of
Clinical Services, SHAWNA NASUTI, N.P.,
PAUL CARATAZZOLA, LICSW, Administrator of
Health Services, PAT DAVENPORT-MELLO, HSA of
Nursing, and MASSACHUSETTS PARTNERSHIP OF
CORRECTIONAL HEALTHCARE,
    Defendants.

**REPORT AND RECOMMENDATION RE:**
**MPCH DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS**
**(DOCKET ENTRY # 97); DEFENDANTS GERALDINE RIENDEAU AND**
**DYANA NICKL'S MOTION FOR SUMMARY JUDGMENT (DOCKET**
**ENTRY # 99); PRO SE PLAINTIFF'S MOTION**
**FOR RELIEF FROM JUDGMENT**
**(DOCKET ENTRY # 92)**

**March 3, 2016**

**BOWLER, U.S.M.J.**

    Pending before this court is a motion for judgment on the

pleadings under Fed.R.Civ.P. 12(c) ("Rule 12(c)") filed by

defendants Barbara Berg ("Berg"), Shawna Nasuti, N.P. ("Nasuti"),

Paul Caratazzola ("Caratazzola"), Patricia Davenport-Mello

("Davenport") and Massachusetts Partnership for Correctional

Healthcare ("MPCH") (collectively "MPCH defendants").  (Docket

Entry # 97).  Defendants Geraldine Riendeau, R.N. ("Riendeau"),

Dyana Nickl ("Nickl") and UMass Correctional Health[1] ("UMCH"),
move for summary judgment under Fed.R.Civ.P. 56 ("Rule 56") on
the retaliation and Eighth Amendment medical claims under 42
U.S.C. § 1983 ("section 1983").  (Docket Entry ## 99, 101).  In
addition to challenging the merits of each claim, they submit
that plaintiff failed to exhaust administrative remedies with
respect to the Eighth Amendment claim for alternative hepatitis C
treatment and a liver transplant.  (Docket Entry # 101, § IV).
They also seek summary judgment on the state law claims due to
lack of exhaustion under Massachusetts General Laws chapter 127
("chapter 127") and their immunity under Massachusetts General
Laws chapter 258, section two.  (Docket Entry ## 99, 101).

Also pending before this court is a motion for relief under
Fed.R.Civ.P. 60(b)(1) and 60(b)(2) ("Rule 60(b)") filed by
plaintiff, an inmate at OCCC.  (Docket Entry # 92).  The motion
seeks relief from a March 24, 2015 Order by the district judge
(Docket Entry # 67), which accepted in part and rejected in part
this court's March 2, 2015 Report and Recommendation.

PROCEDURAL BACKGROUND

Plaintiff filed this civil rights action pro se seeking

---

[1]  The complaint refers to both UMass Correctional Health
Services and UMass Correctional Health.  The latter entity
provided medical services to inmates, including plaintiff Dana E.
Lopes ("plaintiff"), at the Old Colony Correction Center ("OCCC")
in Bridgewater, Massachusetts during the relevant time period.
(Docket Entry # 33-1).  This court therefore construes the pro se
complaint as naming UMass Correctional Health as a defendant.

medical care in the form of alternative medications, namely, boceprevir and telaprevir, to treat his hepatitis C and, once stabilized, a liver transplant. (Docket Entry # 1, ¶¶ 8, 18, 24). He alleges that Riendeau, Lawrence Weiner ("Weiner"), Nickl, UMCH, Berg, Nasuti, Caratazzola, Davenport, MPCH, Riendeau and Nickl ("defendants") were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment under 42 U.S.C. § 1983 ("section 1983"). Liberally construing the pro se complaint, it also raises a retaliation claim against Weiner, Riendeau, her employer (UMCH), Berg, and her employer (MPCH) and that Weiner "palmed off" plaintiff's internal complaint to Nickl.[2] (Docket Entry # 1, ¶¶ 14-17). In addition to the section 1983 retaliation claim, the complaint sets out causes of action for denied or inadequate medical care against defendants

---

[2] The prior Report and Recommendation construed the complaint as raising an Eighth Amendment and state law medical care claims as opposed to also a retaliation claim. (Docket Entry # 60, fn. 2). The opinion directed plaintiff to file a motion for leave to amend the complaint in the event he wished to pursue a retaliation claim. (Docket Entry # 60, fn. 2). Although plaintiff has not filed a motion for leave to amend, he subsequently clarified that the complaint does include a retaliation claim. (Docket Entry # 64, p. 3). Because plaintiff is pro se, in a wheelchair and asserts that he raised retaliation claims, this court will no longer require him to file the motion for leave to amend. The complaint, as presently pled and liberally construed, adequately sets out retaliation claims against the above defendants. Because the Report and Recommendation dismissed the section 1983 Eighth Amendment and state law claims against UMCH for lack of jurisdiction based on Eleventh Amendment immunity under Rule 12(b)(1), this court also lacks jurisdiction to address the retaliation claim against UMCH for the same reasons.

under:  (1) section 1983; (2) article 26 of the Massachusetts
Declaration of Rights; and (3) the Massachusetts Tort Claims Act,
Massachusetts General Laws chapter 258, section two ("MTCA" or
"chapter 258").[3]  In addition to access to the alternative
medications and a liver transplant, plaintiff seeks compensatory
and punitive damages.  (Docket Entry # 1, ¶¶ 18, 24).

On March 2, 2015, this court issued the Report and
Recommendation.  The opinion recommended allowing the MPCH
defendants' summary judgment motion on the Eighth Amendment claim
against the MPCH defendants given the failure to set out a viable
claim of inadequate or denied medical care regarding the failure
to prescribe the alternative medications (boceprevir and
telaprevir) and provide plaintiff a liver transplant.  Because
MPCH contracted to provide the medical care at OCCC in July 2013
(Docket Entry # 33-1, p. 2), the Report and Recommendation
addressed the deliberate indifference of the MPCH defendants
"beginning in July 2013" as opposed before July 2013 when UMCH

---

[3]  It is worth noting that the MTCA "does not create any new
theories of liability, but simply provides that [certain] tort
actions brought against governmental entities are governed by the
same theories of liability that apply to actions involving
private parties." Vining v. Com., 828 N.E.2d 576, 579
(Mass.App.Ct. 2005); accord Sharon v. City of Newton, 769 N.E.2d
738, 748 (Mass. 2002).  In setting out the causes of action in
paragraph 23, the complaint alleges that plaintiff has a
"parallel right" under the MTCA to "be free from cruel and
unusual punishment" and that defendants, in their individual and
official capacities, "have displayed deliberate indifference."
(Docket Entry # 1, ¶ 23).

provided the services.  (Docket Entry # 60, pp. 6, 33).[4]

The opinion additionally recommended denying the MPCH defendants' summary judgment motion based on administrative exhaustion under the Prison Litigation Reform Act, 42 U.S.C. § 1997e(a) ("PLRA"), because it was a genuine issue of material fact as to whether a January 2015 grievance seeking new drugs to treat plaintiff's hepatitis C satisfied the PLRA.  (Docket Entry # 60, 27-29).  This court also addressed and rejected plaintiff's PLRA exhaustion arguments as a means to avoid summary judgment regarding a number of other grievances.  (Docket Entry # 60). Finally, the opinion recommended denying the MPCH defendants' summary judgment on the state law claims due to lack of exhaustion under section 38F of chapter 127 in light of a genuinely disputed material fact as to whether plaintiff's medical condition and health fell within the statute's exception for "exigent circumstances."  (Docket Entry # 60, pp. 29-30).

On March 24, 2015, the district judge accepted the recommendation to allow the MPCH defendants' summary judgment motion on the section 1983 Eighth Amendment claim, rejected this court's determination that there remained a genuine issue of material fact as to whether the January 2015 grievance and appeal satisfied the PLRA and otherwise accepted the Report and

---

[4]  Page references refer to the page as docketed as opposed to the page or appendix number of the document itself.

Recommendation.[5]  Thereafter, plaintiff filed the Rule 60(b)

motion, Riendeau and Nickl filed the summary judgment motion and

the MPCH defendants filed the Rule 12(c) motion.

## I.  Rule 60(b) Motion

Plaintiff seeks relief under Rule 60(b)(1) and 60(b)(2) on a

number of grounds.  Under Rule 60(b)(1), he maintains that this

court made a mistake by:  relying on hearsay to assess the facts;

faulting plaintiff for not appealing July 2012 and November 2013

grievances; erroneously holding that plaintiff should have

appealed the November 2013 grievance even though it was approved;

and advancing a new "theory of defense of sovereign immunity."

(Docket Entry # 94).  Under Rule 60(b)(2), plaintiff seeks to add

new evidence consisting of the grievance policy at OCCC prior to

July 2013, an August 20, 2014 letter from the Health Services

Division of the Massachusetts Department of Correction and print

outs from a website of the National Institutes of Health ("NIH")

regarding boceprevir and telaprevir.

Rule 60(b) sets out a stringent standard to obtain relief

from an order.  See Daniels v. Agin, 736 F.3d 70, 86 (1st Cir.

2013) ("'relief under Rule 60(b) is extraordinary in nature and

motions invoking that rule should be granted sparingly'")

(internal brackets and capitalization omitted).  As explained by

---

[5]  The state law claims against the MPCH defendants, which this
court recommended denying summary judgment on exhaustion under
chapter 127, section 38F, therefore remain in this action.

the First Circuit in <u>Fisher</u>:

> A party seeking relief under Rule 60(b) must demonstrate "at a bare minimum, that his motion is timely; that exceptional circumstances exist, favoring extraordinary relief; that if the judgment is set aside, he has the right stuff to mount a potentially meritorious claim or defense; and that no unfair prejudice will accrue to the opposing parties should the motion be granted."

<u>Fisher v. Kadant, Inc.</u>, 589 F.3d 505, 512 (1st Cir. 2009).

A.   <u>Hearsay Evidence and Advancing New Theory</u>

Relying on Rule 60(b)(1), plaintiff initially argues that the Report and Recommendation mistakenly relied on hearsay. Rule 60(b)(1) provides relief from an order in the event of a "mistake, inadvertence, surprise, or excusable neglect." Fed.R.Civ.P. 60(b)(1). A mistake may encompass a mistake by the court. <u>See</u>, <u>e.g.</u>, <u>Fisher v. Kadant, Inc.</u>, 589 F.3d 505, 512-514 (1st Cir. 2009); <u>F.A.C., Inc. v. Cooperativa de Seguros de Vida de Puerto Rico</u>, 449 F.3d 185, 191 (1st Cir. 2006).

Here, plaintiff contends that this court relied on hearsay in a February 18, 2015 affidavit by Aysha Hameed, M.D. ("Dr. Hameed") "that offered a brand new theory of defense," namely, that plaintiff carried a mutation that predicts resistance to protease inhibitors such as boceprevir and telaprevir. (Docket Entry # 94). Dr. Hameed is a regional medical director employed by MPCH since July 2013 and was "a medical doctor in various DOC facilities" prior thereto. (Docket Entry # 94). In the affidavit, Dr. Hameed avers that she has "personal knowledge of the care and treatment of [plaintiff] at OCCC, and . . . reviewed

his medical records since his admission to OCCC." (Docket Entry # 56-1).

The "hearsay" consists of Dr. Hameed's recitation that:

Mr. Lopes has a specific viral mutation, which predicts resistance to protease inhibitors ("PI") Boceprevir and Telaprevir. Mr. Lopes previously underwent testing at Boston Medical Center, where an attending physician in the Gastroenterology Department recommended that Mr. Lopes avoid PI's.[6]

For the past year, Mr. Lopes' condition has been monitored with multiple lab tests and chronic disease consultations with medical professionals outside of OCCC,[7] while MPCH medical staff have also waited for the U.S. Food and Drug

---

[6] Plaintiff filed a complete copy of the underlying medical record from Boston Medical Center in opposing the MPCH defendants' pending Rule 12(c) motion. (Docket Entry # 116, pp. 10-14). He also attached the NIH documents to the Rule 60(b) motion that classify boceprevir and telaprevir as "protease inhibitors." (Docket Entry # 94, App. 52, 54). The Boston Medical Center record, which was not part of the summary judgment record for the MPCH defendants' prior motion (Docket Entry # 32), states that plaintiff saw David Nunes, M.D. ("Dr. Nunes") at Boston Medical Center on July 23, 2014. The record further reflects that plaintiff's mutation analysis for hepatitis C is a "R155K mutation which is associated with protease resistence" and that he carries the "R155K mutation which predicts resistance to protease inhibitors. He is therefore not [a] good candidate for a protease based treatment regimen." (Docket Entry # 116, pp. 10, 12). The medical record vis-à-vis the MPCH defendants' summary judgment motion, if it had included these underlying notes, would have fully supported the above averment.

[7] The treatment note for the July 23, 2014 appointment with Dr. Nunes, which was not part of the record for the MPCH defendants' prior summary judgment motion (Docket Entry # 32), reflects laboratory tests on April 7 and June 9, 2014. (Docket Entry # 116, p. 12). The treatment note for the January 21, 2015 appointment at Lemuel Shattuck Hospital ("Lemuel Shattuck"), which was part of the prior summary judgment record, shows a laboratory blood test in November 2014. (Docket Entry # 58). The July 23, 2014 medical record, if included in the prior record, as well as the Lemuel Shattuck record, therefore fully support the above averment.

> Administration . . . to approve a new form of treatment.
>
> . . . Mr. Lopes was recently approved by MPCH medical staff to begin treatment with Harvoni, which is expected to start on or around March 2, 2015.

(Docket Entry # 56-1).  The Report and Recommendation summarized this portion of the affidavit in the factual background and relied on it as a means to allow summary judgment for the MPCH defendants on the Eighth Amendment claim.  (Docket Entry # 60, pp. 10, 33-34).

Examining the existence of a mistake within the meaning of Rule 60(b)(1), it is well settled that, "'[H]earsay evidence cannot be considered on summary judgment.'"  Bennett v. Saint-Gobain Corp., 507 F.3d 23, 28 (1st Cir. 2007).  Although plaintiff filed a motion to strike the affidavit, he did not argue that statements in the affidavit were hearsay.  See Desrosiers v. Hartford Life and Acc. Co., 515 F.3d 87, 91 (1st Cir. 2008) (to preserve a party's rights regarding a defective affidavit on summary judgment, the party should, inter alia, "'spell out the nature of the ostensible defects clearly and distinctly'").  Instead, he maintained that the affidavit was argumentative, it raised a new theory that defendants could not treat plaintiff with boceprevir and telaprevir, he received it at the "11th hour" on February 21, 2015, and Dr. Hameed was a well known prison doctor "known for denying care to prisoners."[8]

---

[8]  Plaintiff first raised the hearsay objection in objections to the district judge filed on March 19, 2015.  (Docket Entry # 64).

(Docket Entry # 59).  Thus, as reasoned by the First Circuit in Bellone, this court was free to consider the affidavit with the purported hearsay "because Bellone did not raise any objection to the affidavit below" and, "[i]n any event, Bellone has not challenged the underlying medical record from Dr. Pugach, which would almost certainly have been admissible, see Fed.R.Evid. 803(6), even if the statement in the affidavit was not." Bellone v. Southwick-Tolland Regl. Sch. Dist., 748 F.3d 418, 421 (1st Cir. 2014); see Curet-Velazquez v. ACEMLA de Puerto Rico, Inc., 656 F.3d 47, 54 (1st Cir. 2011); Paterson-Leitch Co., Inc. v. Massachusetts Mun. Wholesale Elec. Co., 840 F.2d 985, 990 (1st Cir. 1988) ("party has a duty to put its best foot forward before the magistrate: to spell out its arguments squarely and distinctly"); see also Maine Green Party v. Maine, Sec. of State, 173 F.3d 1, 4 & n.4 (1st Cir. 1999) (discussing waiver and noting that district judge entitled to reject plaintiff's new argument based on waiver); see generally Kenda Corp., Inc. v. Pot O'Gold Money Leagues, 329 F.3d 216, 225 n.7 (1st Cir. 2003) (pro se status does not insulate a party "'from complying with procedural and substantive law'") (quoting Ahmed v. Rosenblatt, 118 F.3d 886, 890 (1st Cir. 1997), in parenthetical).  Because plaintiff did not mention hearsay or otherwise spell out the argument that the affidavit's statement that plaintiff has a mutation that

_____

predicts his resistence to boceprevir and telaprevir was hearsay, it was not a mistake within the meaning of Rule 60(b)(1) to rely on the evidence.  At most, plaintiff may have generally alluded to a hearsay error by asserting that defendants had not produced evidence because Dr. Hameed was a well known prison doctor known for denying care to inmates.  Alluding to an argument in such a general manner is not the same as spelling out and developing an argument.  See Curet-Velazquez v. ACEMLA de Puerto Rico, Inc., 656 F.3d at 54 ("[a]rguments alluded to but not properly developed before a magistrate judge are deemed waived"); see, e.g., Kenda Corp., Inc. v. Pot O'Gold Money Leagues, 329 F.3d at 225 n.7 (finding pro se party's sufficiency of evidence argument waived).

Alternatively, if properly documented in a summary judgment motion, there is no showing that plaintiff "'has the right stuff to mount a potentially meritorious claim or defense . . ..'"[9] Fisher v. Kadant, Inc., 589 F.3d at 512.  Here, the medical records show that the failure to treat plaintiff with boceprevir and telaprevir beginning in July 2013, when MPCH began providing medical services to OCCC inmates, was not deliberately

---

[9]  In contrast, as discussed infra, the MPCH defendants' Rule 12(c) motion and the Rule 12(c) record (which is limited to the complaint, the answer, matters subject to judicial notice and other narrow categories of material) does not include the documents that would merit judgment on the pleadings on the Eighth Amendment claim.

indifferent.[10]

Past medical records show that plaintiff was treated with
"peg intron" or "Peg Interferon" as well as ribavirin in 2003 and
2004.  (Docket Entry # 1, ¶ 6) (Docket Entry # 101-4, p. 2).  The
treatment was discontinued because plaintiff developed retinal
changes consisting of "cotton wool spots" as well as anemia.[11]
(Docket Entry # 101-4, p. 2) (Docket Entry # 101-2, p. 12)
(Docket Entry # 101-3, p. 3).  By letter dated April 14, 2014,
the Director of Clinical Services in the Health Services Division
of the Massachusetts Department of Correction cited plaintiff's
development of "cotton wool spots" that required stopping "the
Peg Intron treatment" and that the department did not "have an
alternative treatment plan that does not include Peg Intron at
this time."  (Docket Entry # 40-2).  An August 20, 2014 letter to
plaintiff similarly explained that, "boceprevir and telaprevir
medications have to be given with the Peg Interferon" and, "due
to your previous side effects to this[,] you can not be
prescribed this type of treatment."  (Docket Entry # 94, App.
51).  The NIH website documents submitted by plaintiff instruct
that "Boceprevir is used along with two other medications,"
ribavirin and "peginterferon alfa."  (Docket Entry # 94, App.

---

[10]  The deliberate indifference standard is set out under Roman
numeral II.

[11]  Plaintiff agrees that "Interferon" is absolutely poisonous to
him.  (Docket Entry # 94, p. 4).

52).  The regimen requires taking "the peginterferon alfa and ribavirin for 4 weeks before" beginning "treatment with boceprevir."  (Docket Entry # 94, App. 52).  Similarly, "Telaprevir must be taken in combination with peginterferon alfa and ribavirin."  (Docket Entry # 94, App. 54).

Thus, in light of these and other medical records, the refusal or failure to treat plaintiff with boceprevir and telaprevir evidences that the MPCH defendants were not "'aware of facts from which an inference of deliberate indifference could be drawn that a substantial risk of serious harm exist[ed],'" Leavitt v. Correctional Medical Services, Inc., 645 F.3d 484, 497 (1st Cir. 2011), by failing to treat plaintiff with boceprevir and telaprevir beginning in July 2013.[12]  Coupled with the blood tests, computerized axial tomography ("CT") scans in August and December 2013 and oversight plaintiff received during the time the MPCH defendants provided medical services to OCCC inmates, plaintiff fails to show that he has "the right stuff to mount a potentially meritorious" Eighth Amendment claim.[13]  Fisher v.

_____

[12]  The complaint, filed in February 2014, alleges that plaintiff has received no meaningful treatment since at least 2008. Plaintiff has not formally sought leave to amend the complaint with a supplemental pleading setting out events that took place after the February 2014 filing of the complaint.  See Fed.R.Civ.P. 15(d).  Nor has he filed a proposed supplemental complaint.

[13]  As an aside, plaintiff clearly and unambiguously states that he began receiving Harvoni on March 2, 2015.  (Docket Entry # 64, p. 1) (also noting that he received the treatment "in response to this suit").  In the September 2015 opposition to the MPCH

13

Kadant, Inc., 589 F.3d at 512.

Plaintiff next submits that this court made a mistake by advancing the "brand new theory of defense" that his viral mutation predicts a resistance to boceprevir and telaprevir. (Docket Entry # 94).  As noted by plaintiff, in allowing additional exhibits to support the prior summary judgment motion, this court stated that, "[T]he parties shall not include any additional legal arguments."  (Docket Entry # 55).

First, in submitting the affidavit, the MPCH defendants did not make any legal argument.  Rather, they filed the affidavit which set out facts relevant to whether the failure to treat plaintiff with boceprevir and telaprevir was an Eighth Amendment violation.

Second, adding a different reason or even changing the reason to deny plaintiff treatment with boceprevir and telaprevir does not, without more, exhibit deliberate indifference, i.e., an awareness on the part of the MPCH defendants that denying boceprevir and telaprevir to treat plaintiff's hepatitis C posed a substantial risk of serious harm to plaintiff.  See Nunes v.

_____

defendants' motion for judgment on the pleadings, plaintiff also clearly states that he "is now free of the virus."  (Docket Entry # 116, p. 1); see generally Cerqueira v. Cerqueira, 828 F.2d 863, 865 (1st Cir. 1987) (statement in a brief may be treated as an "admission under Rule 56") (paraphrasing United States v. One Heckler-Koch Rifle, 629 F.2d 1250, 1253 (7th Cir. 1980)); accord Lima v. Holder, 758 F.3d 72, 79 (1st Cir. 2014) ("'an admission of counsel during trial is binding on the client' if, in context, it is 'clear and unambiguous'").

Massachusetts Dept. of Correction, 766 F.3d 136, 142 (1st Cir. 2014) (to satisfy "'deliberate indifference' requirement, a plaintiff must show that state officials were 'aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and drew the inference'") (internal ellipses and brackets omitted); Leavitt v. Correctional Medical Services, Inc., 645 F.3d at 497. Moreover, denying treatment because of a risk to the inmate's health (the development of retinal changes) or a lack of any treatment benefit (the mutation based protease resistance) constitutes a reasonable response to the risk of serious harm to plaintiff's health with respect to his hepatitis C and cirrhotic liver. See Kosilek v. Spencer, 774 F.3d 63, 84 (1st Cir. 2014). The argument therefore does not provide relief under Rule 60(b).

B.  Grievances

Plaintiff also argues that his failure to provide the OCCC grievance policy in effect prior to July 2013 was "excusable neglect" under Rule 60(b)(1). The Report and Recommendation recognized that, "The [grievance] policy in effect prior to July 2013 is not in the record." (Docket Entry # 60, p. 12).

Plaintiff also relies on excusable neglect for his failure to argue and cite supporting case law that he exhausted the July 1, 2012 grievance because, when Riendeau checked the box that "'this is not a grievable issue," there was "no administrative remedy to exhaust under the PLRA." (Docket Entry # 94, pp. 3, 6–

15

8) (citing <u>Shaheed-Muhammad v. Dipaolo</u>, 393 F.Supp.2d 80 (D.Mass. 2005), and <u>Brown v. Massachusetts</u>, 950 F.Supp.2d 274, 278 (D.Mass. 2013)).  Plaintiff thus claims excusable neglect due to his failure to argue that he exhausted his remedies under the PLRA because there were no remedies to exhaust.  (Docket Entry # 94).

First, it was not necessary for plaintiff to raise the argument because this court recognized and adhered to the requirement imposed by the PLRA that, "[a]ll 'available' remedies must now be exhausted."  <u>Porter v. Nussle</u>, 534 U.S. 516, 524 (2002).  The Report and Recommendation cited this principle and explained it at length.  (Docket Entry # 60, pp. 23-24).

Second, the circumstances do not show "excusable neglect." "Excusable neglect" encompasses "'inadvertence, mistake, or carelessness, as well as intervening circumstances beyond the party's control.'"  <u>Nansamba v. N. Shore Med. Ctr., Inc.</u>, 727 F.3d 33, 38-39 (1st Cir. 2013) (quoting <u>Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. Partnership</u>, 507 U.S. 380, 388 (1993)). The determination is "'an equitable one, taking account of all relevant circumstances surrounding the party's omission.'"  <u>Id.</u> The "most important" factor "is the reason for the particular oversight."  <u>Id.</u>  "'At a bare minimum, a party who seeks relief from judgment on the basis of excusable neglect must offer a convincing explanation as to why the neglect was excusable.'" <u>Id.</u>

16

The reason plaintiff provides for not locating "First Circuit precedent regarding grievances that are marked 'this is not a grievable issue'" is because he had to "scramble to recover from" a lockup that took place on the day this court issued the Report and Recommendation.  (Docket Entry # 94, pp. 2-3).  There is, however, no excusable reason for plaintiff not having brought the cases to the attention of this court *before* it issued the Report and Recommendation.[14]  Plaintiff's incarceration in the "lockup" on the day the opinion issued and thereafter did not prevent him from bringing the precedent to the attention of this court at an earlier point in time.

Plaintiff additionally asserts that, "This Court faulted [him] for failing to appeal the denied [July 2012] grievance within ten days."  (Docket Entry # 94, p. 6).  The argument misconstrues the record.  The Report and Recommendation simply stated that plaintiff did not check the box at the bottom of the form indicating that "the inmate remains dissatisfied and wished to 'appeal to DOC Health Services Division.'"  (Docket Entry # 60, p. 12).  Immediately thereafter, the opinion states that, "the policy in effect prior to July 2013 is not in the record." (Docket Entry # 60, p. 12).  Thus, the opinion impliedly found that plaintiff did not appeal the July 2012 grievance in the *proper* manner by checking the box as opposed to in a *timely*

---

[14]  In any event, the cases are not convincing as a means to deem the July 2012 grievance exhausted.

17

manner within ten days.  It also implicitly found that plaintiff never filed an appeal of the July 2012 grievance as opposed to never filed one in ten days.  Accordingly, contrary to plaintiff's position (Docket Entry # 94, pp. 6-7), this court did not make an error by applying a ten day appeal period to the July 2012 grievance.  Simply put, this court did not apply a ten day limit as a time period for plaintiff to file an appeal of the July 2012 grievance.

With respect to the November 29, 2013 grievance, plaintiff asserts "that this court made major errors of law in assessing that [plaintiff] should be faulted for not having appealed an APPROVED medical grievance." (Docket Entry # 94, p. 5).  This court addressed and rejected the argument that plaintiff exhausted the November 2013 grievance because Caratazzola deemed it approved.  (Docket Entry # 60, pp. 18-19, 24-26).  For the same reasons, there was no "mistake" of law within the meaning of Rule 60(b)(1) in rejecting plaintiff's argument that he did not have to exhaust an approved grievance.

Plaintiff additionally argues that the MPCH defendants "tricked" him by approving the grievance and instructing him to wait for a follow-up appointment thus allowing the ten day appeal period to expire.  (Docket Entry # 94).  Plaintiff submitted the grievance on November 29, 2013.  The grievance complained about a series of canceled appointments and a lack of medical treatment for eight months.  As stated in the grievance, plaintiff advised

18

Caratazzola on multiple occasions about the inability to obtain treatment at medical facilities outside OCCC.  On December 18, 2013, Caratazolla approved the grievance, noting that plaintiff's medical records showed he was seen at "the U MA Memorial Hospital Liver Clinic for further testing on 12/12/13" and "Dr. Carson, tour medical provider, . . . will schedule a follow up appointment with you upon receipt of that consultation." (Docket Entry # 57, p. 3) (Docket Entry # 31, Ex. 5).

Plaintiff did not file an appeal of Caratazolla's decision. The remedy nevertheless remained available notwithstanding the approval and indication of a follow-up appointment.  In fact, the decision noted that, "An appeal must be filled out within 10 working days."  (Docket Entry # 57, p. 3) (Docket Entry # 31, Ex. 5).  Thus, even assuming that the First Circuit would find "that, in some circumstances the behavior of the defendants may render administrative remedies unavailable, for purposes of the PLRA," Giano v. Goord, 380 F.3d 670, 675 (2nd Cir. 2004), Caratazzola's behaviour does not rise to that level.  Hence, there was no "mistake" within the meaning of Rule 60(b)(1).

C.  Sovereign Immunity Defense

Plaintiff next argues that this court made a mistake in the Report and Recommendation (Docket Entry # 60, pp. 34-44) by considering a defense (sovereign immunity) that "the UMAss Corr health defendants" did not plead in their answer.  (Docket Entry # 94).  Rather, they plead only qualified immunity, according to

plaintiff.

In July 2014, UMCH filed a motion to dismiss the complaint under Fed.R.Civ.P. 12(b)(1) based on its "sovereign immunity" under the Eleventh Amendment as "an arm of the state." (Docket Entry # 26) (Docket Entry # 27, pp. 4, 7).  In lieu of filing an answer to the complaint, UMCH filed the motion to dismiss.  See Fed.R.Civ.P. 12(b) ("motion asserting any of these defenses must be made before pleading"); see Marcial Ucin, S.A. v. SS Galicia, 723 F.2d 994, 997 (1st Cir. 1983) ("objective of Rule 12 is to eliminate unnecessary delay at the pleading stage by requiring the presentation of an omnibus pre-answer motion in which defendant advances every available Rule 12 defense"); see, e.g., Gerald v. Univ. of Puerto Rico, 707 F.3d 7, 16 (1st Cir. 2013) ("[i]n lieu of an answer, the [defendants] filed a joint motion to dismiss").  After analyzing the issue, this court recommended allowing the motion (Docket Entry # 60, pp. 34-44) and the district judge accepted the recommendation in the March 24, 2015 Order (Docket Entry # 67).  UNCH therefore never filed an answer.

Nickl and Riendeau, however, did file answers and each raised the defense of qualified immunity. (Docket Entry ## 23, 24).  The Report and Recommendation only addressed the UMCH motion and the defense of sovereign immunity properly raised in that motion.  The fact that different defendants did not raise a sovereign immunity defense does not prevent this court from addressing the defense properly raised by another defendant in a

20

Rule 12(b) pre-answer motion.  Accordingly, plaintiff's sovereign immunity argument does not warrant relief under Rule 60(b).

As a final matter, plaintiff seeks reconsideration under Rule 60(b) of the district judge's denial of a motion for sanctions (Docket Entry # 89) and this court's denial without prejudice of a motion for appointment of counsel (Docket Entry # 62).  Neither order provides a basis for reconsideration under Rule 60(b).  See Daniels v. Agin, 736 F.3d at 86 (Rule 60(b) motions "'should be granted sparingly'"); Fisher v. Kadant, Inc., 589 F.3d at 512 (setting out minimum requirements to obtain relief under Rule 60(b)).

## II.  Riendeau and Nickl's Summary Judgment Motion

Riendeau and Nickl seek summary judgment on the retaliation and Eighth Amendment medical claims on the merits and due to a failure to exhaust administrative remedies under the PLRA. (Docket Entry # 99).  They also move for summary judgment on the state law claims based on a lack of exhaustion under chapter 127 and their immunity under chapter 258, section two.  (Docket Entry # 99).  Plaintiff did not file an opposition to the motion.

## STANDARD OF REVIEW

As explained in the prior Report and Recommendation, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(a). It is inappropriate "if the record is sufficiently open-ended to

permit a rational factfinder to resolve a material factual dispute in favor of either side." <u>Pierce v. Cotuit Fire District</u>, 741 F.3d 295, 301 (1st Cir. 2014).

"Genuine issues of fact are those that a factfinder could resolve in favor of the nonmovant, while material facts are those whose 'existence or nonexistence has the potential to change the outcome of the suit.'" <u>Green Mountain Realty Corp. v. Leonard</u>, 750 F.3d 30, 38 (1st Cir. 2014) (quoting <u>Tropigas de Puerto Rico, Inc. v. Certain Underwriters at Lloyd's of London</u>, 637 F.3d 53, 56 (1st Cir. 2011)).  The evidence is viewed "in the light most favorable to the non-moving party," plaintiff, and "all reasonable inferences" are drawn in his favor. <u>Ahmed v. Johnson</u>, 752 F.3d 490, 495 (1st Cir. 2014).  In reviewing a summary judgment motion, a court may examine "all of the record materials on file," <u>Geshke v. Crocs, Inc.</u>, 740 F.3d 74, 77 (1st Cir. 2014), "including depositions, documents, electronically stored information, affidavits or declarations . . . or other material." Fed.R.Civ.P. 56(c)(1); <u>see Ahmed v. Johnson</u>, 752 F.3d at 495. Plaintiff's failure to controvert statements of undisputed facts in Riendeau and Nickl's LR. 56.1 statement may result in the facts being admitted for purposes of the summary judgment motion. LR. 56.1; <u>Cochran v. Quest Software, Inc.</u>, 328 F.3d 1, 12 (1st Cir. 2003) (plaintiff's failure to contest date in LR. 56.1 statement of material facts caused date to be admitted on summary judgment); <u>Stonkus v. City of Brockton School Department</u>, 322

F.3d 97, 102 (1st Cir. 2003); <u>see Sutliffe v. Epping School Dist.</u>, 584 F.3d 314, 321 (1st Cir. 2009) (plaintiffs' "pro se status did not relieve them of their responsibility to comply with procedural rules").

Plaintiff signed the complaint as "Sworn under pain and penalty of perjury." (Docket Entry # 1). Accordingly, facts based on personal knowledge in the complaint are part of the summary judgment record. <u>See Sheinkopf v. Stone</u>, 927 F.2d 1259, 1262-1263 (1st Cir. 1991); <u>see also Goldman, Antonetti, Ferraiuoli, Axtmayer & Hertell v. Medfit International, Inc.</u>, 982 F.2d 686, 689-690 (1st Cir. 1993) (pursuant to 28 U.S.C. § 1746, "an unsworn statement signed under penalty of perjury may be used, in lieu of a sworn statement or affidavit, to support or oppose a motion for summary judgment"); <u>United States v. Gomez-Vigil</u>, 929 F.2d 254, 258 (6th Cir. 1991); <u>Uncle Henry's, Inc. v. Plaut Consulting, Inc.</u>, 240 F.Supp.2d 63, 69 (D.Me. 2003). Conclusory allegations in the complaint, however, "do not pass muster, and hence, must be disregarded." <u>Sheinkopf v. Stone</u>, 927 F.2d at 1259, 1262. Adhering to this framework, the record sets out the following facts for purposes of Riendeau and Nickl's summary judgment motion.

<u>FACTUAL BACKGROUND</u>[15]

---

[15]  Inasmuch as this court may consider other evidence in the record even though not cited by Riendeau and Nickl, <u>see</u> Fed.R.Civ.P. 56(c)(3), certain portions of the factual background cite other documentation and summary judgment evidence in the

Throughout the relevant time period, plaintiff was an inmate residing at OCCC.[16]  (Docket Entry # 1).  Prior to July 2013, UMCH provided medical care to inmates at OCCC.  In July 2013, the Massachusetts Department of Correction ("DOC") contracted with MPCH to provide medical services to OCCC inmates.  (Docket Entry # 33-1).

Riendeau was the health services administrator ("HSA") at OCCC up until July 2013.  (Docket Entry # 1, ¶ 2).  She left the facility in July 2013 when MPCH took over the contract for providing medical services to OCCC inmates.[17]  (Docket Entry # 1, ¶ 20).  Nickl "worked as senior director of programs for [UMCH]." (Docket Entry # 1, ¶ 2).

A.  Medical Care

Plaintiff, a 61 year old male, has a history of hepatitis C, a chronic liver disease.  (Docket Entry ## 1-2, 1-4).  He is confined to a wheelchair.  (Docket Entry # 1-2).  His history of hepatitis C dates back more than 35 years.  (Docket Entry ## 101-4, 101-7).  He also suffers from cirrhosis of the liver and end-

---

record and, in so doing, may repeat factual findings based on those exhibits set out in the prior Report and Recommendation.

[16]  In 2006, plaintiff was treated at "SBCC," an acronym for the Souza Baranowski Correctional Center in Shirley, Massachusetts, and therefore may have been an inmate at SBCC during that time period.

[17]  Although summarized in the factual background, plaintiff's medical care after July 2013 is therefore not material to the deliberate indifference medical care claim against Riendeau.

24

stage liver disease.  (Docket Entry # 101-2).

From November 2003 to May 2004, plaintiff received "peg-
intron" as well as ribavirin to treat the hepatitis C.  (Docket
Entry # 101-4, p. 2) (Docket Entry # 1, ¶ 6).[18]  The drug regimen
ended, however, because plaintiff developed "anemia and vision
changes with cotton wool-spots seen on his eye exam."  (Docket
Entry # 101-4, p. 2); (Docket Entry # 101-2, p. 12) (Docket Entry
# 101-7, pp. 2, 3) (Docket Entry # 1-2, p. 13) (Docket Entry # 1,
¶ 6).  UMCH neither provided nor offered plaintiff an alternative
drug regimen for his hepatitis C.  (Docket Entry # 1, ¶ 6).

In August 2005 and April 2006, while incarcerated, plaintiff
was treated at Tufts-New England Medical Center ("Tufts").  An
April 2006 medical note reflects a weight of 300 pounds, a body
mass index ("BMI") of 35, bilateral edema in the extremities and
multiple scabbed skin lesions.  (Docket Entry # 101-4).
Plaintiff also reported "chronic upper right quadrant pain that
requires oxycodone."  (Docket Entry # 101-4).  The Tufts
physician noted that plaintiff was not a candidate for a liver
transplant:

> due to a couple of issues.  One is his body weight.  He has
> a BMI of 35.  We do not perform transplants on patient[s]

---

[18]  The complaint reflects that the treatment took place "in 2006
or 2007."  (Docket Entry # 1, ¶ 6).  The temporal discrepancy is
not material to the summary judgment analysis.  The point remains
that, before and after the introduction of boceprevir and
telaprevir in 2011, plaintiff could not tolerate "interferon and
ribavirin therapy" because of negative side effects to his
vision.  (Docket Entry # 1-2, p. 13).

> unless the BMI is 30 or less given that there is a high-risk
> mortality and morbidity in performing surgery.  Secondly, he
> has chronic abdominal pain of unclear etiology and is
> dependent on narcotics for pain control.  For our Pre-Liver
> Transplant patients, we do prefer discontinuing any
> narcotics medications as there is concern for dependency.

(Docket Entry # 101-4).  The physician also noted that

plaintiff's blood work gave "him a MELD score of 11, which"

placed "him low on the liver transplant list if he were to be

listed." (Docket Entry # 101-4).  In fact, the physician posited

that, "With this MELD score, the risk of dying from the liver

transplant would be higher than from the risk of dying from his

liver disease." (Docket Entry # 101-4).

Thereafter in 2006, Philip Tavares, M.D. ("Dr. Tavares") of

UMCH examined plaintiff at SBCC and assessed his end-stage liver

disease as stable.  (Docket Entry # 101-2, p. 4).  Dr. Tavares'

note repeats the Tufts' physician's finding to lose weight and

discontinue narcotics to be considered for a liver transplant.

Plaintiff agreed to a weight loss program.  (Docket Entry # 101-

2, p. 4).  In another 2006 visit, Dr. Tavares planned to check

the date of plaintiff's last liver ultrasound and order another

ultrasound or CT scan "as indicated." (Docket Entry # 101-2, p.

10).  UMCH progress notes in 2006 evidence that plaintiff was

seen several other times in the SBCC infirmary.[19]  During each

visit, plaintiff's condition is described as stable.  (Docket

---

[19]  The form progress notes are designated "infirmary" at the
bottom of the pages.  (Docket Entry # 101-2).

Entry # 101-2).

A July 2006 progress note evidences that "A. Enaw, M.D."
("Dr. Enaw") examined plaintiff at the SBCC infirmary.  The
progress note repeats the plan that plaintiff is not a candidate
for a liver "transplant due to excessive weight."  (Docket Entry
# 101-2).  Dr. Enaw also noted multiple skin lesions and that
plaintiff was seen in dermatology twice with no specific
diagnosis.

In 2011, the Food and Drug Administration ("FDA") approved
two new medications to treat hepatitis C, namely, boceprevir and
telaprevir.  (Docket Entry # 1, ¶ 8) (Docket Entry # 33, ¶ 6).
To date, plaintiff has not received these medications.[20]  NIH
documents located on the agency's website state that, "Boceprevir
is used along with two other medications," ribavirin and
"peginterferon alfa."[21]  (Docket Entry # 94, App. 52).  The

---

[20]  The primary relief plaintiff seeks in the complaint is to
receive these alternative medications to treat his hepatitis C.
Thereafter and once his condition stabilizes, he requests a liver
transplant.  (Docket Entry # 1).  Because he began receiving a
different medication, Harvoni, in March 2015 (Docket Entry # 64),
which he acknowledges worked because he "is now free of the
virus" as of September 2015, he continues to seek a liver
transplant due to the deterioration of his liver that resulted
from defendants' neglect.  (Docket Entry # 116).

[21]  Consideration of the documents filed by plaintiff is
appropriate.  See Fed.R.Civ.P. 56(c)(3); Arroyo v. Volvo Group
N.A., LLC, 805 F.3d 278, 285 & n.1 (7th Cir. 2015) (although
plaintiff did "not cite to any specific emails," she included
"emails and other materials in the record, so we are free to
consider them") (citing Fed.R.Civ.P. 56(c)(3)).

regimen requires taking ribavirin and "peginterferon alfa" for four "weeks before" beginning "treatment with boceprevir." (Docket Entry # 94, App. 52).   Similarly, "Telaprevir must be taken in combination with peginterferon alfa and ribavirin." (Docket Entry # 94, App. 54).

In March 2012, plaintiff saw Richard J. Rohrer, M.D. ("Dr. Rohrer"), Chief of the Division of Transplant Surgery at Tufts Medical Center.   Dr. Rohrer noted that plaintiff "has a long history of a chronic active hepatitis C" and "did not tolerate interferon therapy."   (Docket Entry # 101-7).   Dr. Rohrer reviewed a March 2012 CT scan which showed a 1.5 centimeter lesion in plaintiff's liver that met the criteria for hepatocellular carcinoma ("HCC"), a cancer that originates in the liver.   A September 2008 CT scan initially revealed the liver mass then measuring roughly two centimeters.   Plaintiff was initially "followed by Dr. Robert Martell, M.D. at Tufts Medical Center."   (Docket Entry # 1-2).   "Preliminary reports" included information "consistent with HCC."   (Docket Entry # 1-2).

Plaintiff received multiple repeat CT scans to monitor the lesion.   A repeat CT scan in January 2009 showed a decrease in size to 1.6 centimeters.   A February 2010 CT scan showed a 1.8 centimeter lesion.   A March 2011 CT scan reflected a decrease in size of 1.5 to 1.6 centimeters.   (Docket Entry # 1-2).   The March 2012 CT scan measured the lesion at 1.5 centimeters and showed several other foci of arterial enhancement believed to "represent

dysplastic nodules." (Docket Entry # 101-7).

After reviewing the March 2012 CT scan, Dr. Rohrer explained that, "A single, small lesion would *not* qualify for a liver transplant, and it would have to be observed" as a two centimeter lesion "to make appropriate strategic decisions regarding liver transplantation." (Docket Entry # 101-7) (emphasis added). He further noted that, "If a liver transplantation turned out not to be an option, then local treatment with radiofrequency ablation and transarterial chemoembolization may prove to be very valuable." (Docket Entry # 101-7).

On April 24, 2012, Angela S. Dantonio, N.P. ("Dantonio") evaluated plaintiff at UMass Memorial Medical Center ("UMass Memorial") in Worcester, Massachusetts. Like Dr. Rohrer, she stated that the lesion shown in the March 2012 CT scan was consistent with HCC. Plaintiff "could potentially be a liver transplant candidate," but more information was needed, according to Dantonio. (Docket Entry # 101-7). Accordingly, plaintiff was scheduled for a four phase "CT scan of the abdomen and pelvis" to "better assess the stage of his disease." (Docket Entry # 101-7) (Docket Entry # 1-2, p. 8). Dantonio explained to plaintiff "that if the 4-phase CT scan confirms the presence of a single HCC lesion that is under" two centimeters, it "could either be treated with radiofrequency ablation, or" monitored until it reaches two centimeters, "at which time" plaintiff could potentially be listed for a "transplant with MELD exception

points." (Docket Entry # 101-7).  She emphasized that "a more complete work-up" was needed to "determine his transplant candidacy." (Docket Entry # 101-7).  Upon physical examination, plaintiff's weight was down to 215 pounds and his BMI was 32. (Docket Entry # 101-7).  Dantonio's clinic note reflects that plaintiff's "edema is medically managed with diuretic therapy." (Docket Entry # 101-7).

On May 11, 2012, plaintiff underwent the four phase CT scan of his pelvis and abdomen.  The CT scan report concluded that the liver mass "should be considered as hepatocellular carcinoma unless proven otherwise" and noted "[c]hanges of advanced cirrhosis." (Docket Entry # 1-2).  There was, however, "no evidence of ascites" and the pancreas, spleen, kidneys and adrenal glands showed no abnormality.  (Docket Entry # 1-2).

On May 17, 2012, plaintiff was seen by "multiple providers" at the UMass Medical Center Hepatocellular Carcinoma Program Clinic ("the UMass clinic") at UMass Memorial.  (Docket Entry # 1-2).  The purpose of the visit was to assess plaintiff's "[c]hronic hepatitis C, cirrhosis and liver mass." (Docket Entry # 1-2).  The UMass clinic's outpatient consultation report for the visit reflects that plaintiff "has been followed for a stable hepatic lesion in the setting of hepatitis C and cirrhosis." (Docket Entry # 1-2).  It also reflects plaintiff's history of "[c]hronic hepatitis C genotype 1a," cirrhosis, chronic lower back pain, deep vein thrombosis ("DVT") and a plan to see him

30

again in three months and maintain "active surveillance."
(Docket Entry # 1-2).

The UMass clinic note the same day describes plaintiff's
medical history as including "[d]ecompensations from his liver
disease [that] have included fluid overload, peripheral edema,
some fatigue and esophageal varices."  (Docket Entry # 1-2).  The
note states, "No plans currently for hep C treatment."  (Docket
Entry # 1-2).  The note also includes plaintiff's past history of
"interferon and ribavirin therapy for [plaintiff's] hepatitis C,
but" that plaintiff "developed retinal changes."  (Docket Entry #
1-2).

Three radiologists reviewed the May 11, 2012 four phase CT
scan and took part in a multidisciplinary conference at the
clinic on May 17, 2012.  The mass did *not* show "the classic
washout for hepatocellular carcinoma."  (Docket Entry # 1-2).
After an extensive discussion among the medical providers, the
group decided to obtain an MRI "and[,] if still ambiguous[,] . .
. may recommend proceeding to a liver biopsy."  (Docket Entry #
1-2, pp. 14, 18).

On June 25, 2012, UMCH health services progress notes show
that medical staff at OCCC reviewed the UMass clinic's outpatient
consultation report with plaintiff.  An ultrasound was normal and
the June 2012 note shows a plan to continue to monitor and assess
plaintiff's condition.  (Docket Entry # 101-2).  Plaintiff agreed
to the MRI, as recommended by the UMass clinic.  (Docket Entry #

31

101-2).

On July 1, 2012, plaintiff filed a grievance requesting a biopsy, commencement of the process "to obtain a cadaver liver" and "alternative hep c treatment" to eradicate the "cancerous lesion." (Docket Entry # 1-3). Riendeau reviewed the grievance and denied it on July 9, 2012. (Docket Entry # 1-3) (Docket Entry # 1, ¶¶ 2, 14, 20). In denying the grievance, she commented that plaintiff's "treatment plan is appropriate" and that he would be undergoing the MRI to determine if a biopsy is indicated. (Docket Entry # 1-3) (Docket Entry # 101-5).

In August 2012, plaintiff had the MRI. (Docket Entry # 101-3, p. 3). On November 26, 2012, he underwent a fine needle aspiration ("FNA") biopsy and a radio frequency ablation of the lesion at UMass Memorial. (Docket Entry # 101-2). The biopsy showed a benign adenomatous lesion, according to UMass clinic notes. (Docket Entry # 1-4).

On December 28, 2012, plaintiff had a three phase CT scan of his abdomen and pelvis. The scan showed no abnormalities other than a large ablative cavity in the area where the lesion was ablated and a small hepatic lesion. (Docket Entry # 1-4).

On January 31, 2013, plaintiff was seen again at the UMass clinic. The clinic note describes the lesion "clinically" as "a benign adenoma" and that, "on extensive review by Dr. Switzer with several pathologists, the FNA was not diagnostic of malignancy" and, "in any case," the lesion was ablated. (Docket

Entry # 1-4, p. 9).  It further states that, "As a patient with cirrhosis, he is at risk for developing further HCC and will be followed." (Docket Entry # 1-4).  Accordingly, the multidisciplinary team at the clinic decided to continue surveillance of plaintiff's condition with imaging three months after the December 28, 2012 CT scan. (Docket Entry # 1-4, p. 10).

Bradley Switzer, M.D. ("Dr. Switzer") also examined plaintiff at UMass Memorial on January 31, 2013, and likewise noted the consensus "to proceed with active surveillance and a followup CT scan" in three months. (Docket Entry # 1-4, p. 12). Dr. Switzer's medical note states that:

> From a hepatic standpoint, this patient does have Child-Puigh A cirrhosis with 6 points.  He is well compensated with no regular decompensation and should be continued to be followed regularly by a gastroenterologist regarding his underlying hepatitis C and liver disease.

(Docket Entry # 1-4, p. 12).

Dr. Switzer performed a limited examination of plaintiff at UMass Memorial the same day.  Upon examination, there was no edema in plaintiff's extremities. (Docket Entry # 1-4).  Dr. Switzer reviewed plaintiff's pathology with at least three pathologists and noted that the "lesion has been ablated and there is no evidence . . . of residual disease." (Docket Entry # 1-4) (Docket Entry # 101-2, pp. 14, 15).

In March 2013, plaintiff was admitted to Lemuel Shattuck based on a "[s]elf-induced low nutritional intake." (Docket

Entry # 101-3).   Medical staff recommended continued management on an outpatient basis of plaintiff's liver disease and continued dosing of diuretic medication.   The discharge summary states that plaintiff's hepatitis C treatment "with interferon and ribavirin . . . was discontinued for retinal changes."   (Docket Entry # 101-3, p. 3).

In July 2013, MPCH began providing the medical services to OCCC inmates previously provided by UMCH.   (Docket Entry # 33-1, p. 2).   Riendeau left OCCC when MPCH outbid UMCH for the contract.   (Docket Entry # 1, ¶ 20).

In an April 14, 2014 letter, the Director of Clinical Services of DOC Health Services Division advised plaintiff that, MPCH did not "have an alternative treatment plan that does not include the Peg Intron at this time" and is "working on obtaining newer treatments."   (Docket Entry # 40-2, p. 1).   The letter explains that plaintiff's prior development of "cotton wool spots" caused by the "Peg Intron treatment" could "cause blindness if the treatment is not stopped."   (Docket Entry # 40-2, p. 1).   An August 20, 2014 letter to plaintiff from the Assistant Deputy Commissioner of the DOC Health Services Division reiterates, more specifically, that, "Boceprevir and Talaprevir medication have to be given with the Peg Interferon."   (Docket Entry # 94, App. 51).   Consequently, due to plaintiff's prior negative side effects, the letter notes that plaintiff could not receive this treatment but that newer medications are "awaiting

FDA approval this fall." (Docket Entry # 94, App. 51).

Meanwhile, in June 2014, plaintiff had blood tests to monitor his liver. On July 23, 2014, he underwent testing at Boston Medical Center. Plaintiff reported no upper right quadrant pain, "jaundice, dark urine or pruritus." (Docket Entry # 116, App. 59). Upon physical examination, Dr. Nunes described plaintiff as having no skin rashes. (Docket Entry # 116, App. 60). Dr. Nunes additionally noted that plaintiff carried an "R155K mutation which is associated with protease resistance" and "is therefore not a good candidate for a protease based treatment regimen." (Docket Entry # 116, App. 59). Dr. Nunes further stated that, "Protease based regiments are relatively contraindicated in deccompensated [sic] cirrhosis diue [sic] to the risk of worsening [the] liver disease." (Docket Entry # 116, App. 59). Given plaintiff's "relatively stable disease," Dr. Nunes recommended waiting for the "availability of replication complex inhibitors." (Docket Entry # 116, App. 61).

In October 2014, the FDA approved the use of Harvoni to treat chronic hepatitis C. (Docket Entry # 94, App. 56). The Harvoni regimen provided "the first FDA-approved interferon- and ribavirin-free regimen to treat hepatitis C." (Docket Entry # 94, App. 57). On January 21, 2015, plaintiff was seen in the gastroenterology clinic at Lemuel Shattuck to discuss initiating hepatitis C treatment with the new medication. (Docket Entry # 58, App. 57-58). After examining plaintiff and reviewing his

medical history and recent blood work, the physician recommended
Harvoni to treat plaintiff's hepatitis C.  (Docket Entry # 58,
App. 48).  Plaintiff acknowledges that he received Harvoni on
March 2, 2015, albeit in response to this lawsuit, and "is now
free of the virus" as of September 2015.[22]

As to other or related medical conditions, plaintiff "has
had DVT in the past" and experiences chronic lower back pain.
(Docket Entry ## 1-2, 1-4).  His chief complaint at the May 17,
2012 visit and examination at UMass Memorial was swelling in the
lower part of his left leg with redness.  (Docket Entry # 1-2, p.
13).  Plaintiff attests he "has blood pooling up under his skin."
(Docket Entry # 1, ¶ 10) (Docket Entry # 1-2).  During the visit,
he expressed a concern about cellulitis in his lower left leg.
An ultrasound of the leg on the same day did not show a blood
clot.  As a result of the "significant edema," dosages of
plaintiff's diuretic medications were increased.  (Docket Entry #
1-2).  On June 25, 2012, plaintiff was seen at OCCC by medical
staff.  Health services progress notes for the visit reflect that
the medications were ordered to address the fluid overload and
that plaintiff's chemistries would be repeated again to assess
the effects from the increased dosages.  (Docket Entry # 101-2,
p. 3).  The UMass clinic noted no significant ascites at the
January 31, 2013 visit and examination.  At the time plaintiff

---

[22] See footnote 13.

filed the February 2014 complaint, his legs were "swollen-about three times normal girth." (Docket Entry # 1, ¶ 18).

B.  Retaliation and Related Grievances

At an undermined time in 2012, plaintiff complained about Riendeau to the Department of Public Health Division of Health Professions Licensure, Office of Public Protection ("the Registration Board"). (Docket Entry # 1, ¶ 14). By letter dated October 2, 2012, the Registration Board advised plaintiff it had initiated an inquiry regarding the allegations. (Docket Entry # 1-3, p. 2). On November 13, 2012, plaintiff sent the Registration Board a copy of the July 2012 grievance that Riendeau denied. (Docket Entry # 1-3, pp. 4, 6). On November 26, 2012, the Registration Board mailed plaintiff a complaint form and asked him to complete it to facilitate the investigation. (Docket Entry # 1-3, p. 3). In the complaint form, plaintiff states that Riendeau repeatedly canceled doctors' orders, including orders for a liver biopsy and placement on an organ donor list, and that "[n]o alternative treatment is being offered." (Docket Entry # 1-3, pp. 7-8)). The Registration "Board decided not to discipline" Riendeau. (Docket Entry # 1, ¶ 14).

Undeterred, on December 31, 2012, plaintiff wrote to the Director of Accreditation, National Commissions on Correctional Health, regarding Riendeau and his need for a liver transplant

and alternative treatment for his hepatitis C.  (Docket Entry #
1-3, p. 10).  The letter states that Nasuti ordered skin lotion
and a certain kind of soap for plaintiff but that Riendeau
canceled the orders.  (Docket Entry # 1-3, p. 10).

On December 21, 2012, plaintiff submitted a formal grievance
to the health services unit by completing an Inmate Medical
Grievance and Appeal Form.  Therein, he complained about an
inability to obtain "KOP" status for two skin lotions, Eucerin
lotion and "Evoke skin Citrus Vanilla Aromatherapy moisturizer"
purportedly ordered by Nasuti.[23]  (Docket Entry # 1-3, p. 9).
The December 21, 2012 grievance also notes that Riendeau canceled
the orders and that he had filed "grievances" against her with
the Registration Board.  (Docket Entry # 1-3, p. 9).

On December 31, 2012, Nasuti treated plaintiff's skin
condition at OCCC.  (Docket Entry # 101-2, p. 18).  She observed
multiple open skin tears and areas of hyperpigmentation and
assessed a "decreased skin integrity."  (Docket Entry # 101-2, p.
18).  In order "to prevent overuse or diversion," Nasuti's plan
was to advise management "to portion out [the] lotion daily."
(Docket Entry # 101-2, p. 18).

On January 2, 2013, Riendeau denied the December 21, 2012
grievance because plaintiff had received the Eucerin lotion and
the "citrus vanilla aromatherapy lotion" was "not medically

---

[23]  This court assumes that KOP refers to keep on person, i.e.,
being able to keep the lotions on his person.

indicated." (Docket Entry # 1-3, p. 9). In denying the grievance, Riendeau checked a box that, "This is not a grievable issue" and another box that, "This issue has been previously addressed." (Docket Entry # 1-3, p. 9).

By letter dated January 4, 2013, plaintiff appealed the denial to the Health Services Division.[24] The appeal explicitly states that, "Riendeau retaliated against me for complaining about her" to the Registration Board by denying the orders for skin lotion and modifying "that refusal to allow me Eucerin, but only if I wait in line every day." (Docket Entry # 1-3, p. 11). By letter dated February 1, 2013, Weiner, the assistant deputy commissioner of clinical services for DOC, denied the appeal. As a reason for the denial, Weiner explained that plaintiff was "provided with a sufficient amount of eucerin cream to treat your medical condition via the Medication line" and that "the amount of cream dispensed to you was changed as the result of a KOP audit in which you were found non compliant."[25] (Docket Entry # 1-3, p. 13) (Docket Entry # 101-5, p. 4).

Notwithstanding the statement in Weiner's letter that the decision was "final," plaintiff filed a similar grievance on

---

[24] The appeal raised a new issue that plaintiff "need[ed] a liver transplant and alternative treatment for hepatitis C (Interferon gives me retina problems)." (Docket Entry # 1-3, p. 11).

[25] The above statement is not considered for the truth of the matter asserted, i.e., that a KOP audit found plaintiff non-compliant. It is considered as the reason proffered for the denial of the appeal.

February 18, 2013 with the health services unit.  Therein, he
complained about his inability to obtain medications and skin
creams as well as his inability to have "KOPs" that Nasuti
previously ordered.  (Docket Entry # 101-5, p. 9).  The grievance
also describes his inability to obtain medication because only
one of the ten nurses at OCCC, Berg, had the authority to
dispense plaintiff's medications.  The grievance asks that all of
the OCCC nurses be allowed to dispense his medications.  (Docket
Entry # 1-4, pp. 1-2) (Docket Entry # 101-5, pp. 9-10).  Riendeau
denied the grievance on February 22, 2013, because the issue "has
been resolved and [plaintiff] will obtain [his] medication from
the medication line as discussed."  (Docket Entry # 1-4).

        Plaintiff checked the appropriate box indicating his desire
to appeal the decision to the DOC Health Services Division.[26]  By
letter dated February 27, 2013, plaintiff wrote to the division.
The letter, designated as an appeal, complains about the
confiscation of plaintiff's medications from his cell followed by
the return of the medications and the confiscation of them the
next day.  The letter also describes the complaint plaintiff made
with the Registration Board and asserts that Riendeau was
instructing officers to confiscate the medications and, after the
return of the medications, having officers confiscate the
medications again.  (Docket Entry # 1-4, p. 4) (Docket Entry #

---

[26]  On February 22, 2013, plaintiff wrote another letter to the
Registration Board.

40

101-5, p. 7).

Weiner addressed the appeal in a letter to plaintiff on March 5, 2013.  (Docket Entry # 1, ¶ 17) (Docket Entry # 1-4, p. 7) (Docket Entry # 101-5, p. 6).  As set forth in the letter, Weiner referred the harassment allegations about Riendeau to Nickl, senior director of program operations for UMCH.[27]  (Docket Entry # 1, ¶ 17) (Docket Entry # 1-4, p. 7) (Docket Entry # 101-5, p. 6).

On May 23, 2013, the Grievance Appeal Coordinator ("the Grievance Coordinator") of the Correctional Health and Criminal Justice Program at the University of Massachusetts Medical School wrote to plaintiff regarding Weiner's March 5, 2013 letter regarding plaintiff's February 27, 2013 appeal of the February 18, 2013 grievance.  Explaining that he had been asked to respond to the allegations of harassment by Riendeau of instructing officers to confiscate plaintiff's "KOP medications from [his] cell," the Grievance Coordinator found "no evidence to support" the allegations.  (Docket Entry # 101-5, p. 2).

<u>DISCUSSION</u>

A.  <u>Section 1983 Eighth Amendment Medical Care Claim</u>

Riendeau and Nickl initially argue that plaintiff fails to set out a serious medical need that went unmet.  Separately, they

---

[27]  The complaint alleges that Weiner "palmed off the complaint" to Nickl and that, "All of this is retribution for plaintiff having complained of Riendeau to the" Registration Board. (Docket Entry # 1, ¶ 17).

maintain that neither Riendeau nor Nickl acted with deliberate indifference.  (Docket Entry # 101, § II).

In order to succeed in an Eighth Amendment claim under section 1983 based on denied or inadequate medical care, a prisoner must satisfy:  "(1) an objective prong that requires proof of a serious medical need, and (2) a subjective prong that mandates a showing of prison administrators' deliberate indifference to that need." Kosilek v. Spencer, 774 F.3d at 82; Leavitt v. Correctional Medical Services, Inc., 645 F.3d at 497. "Deliberate indifference means that 'a prison official subjectively "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."'" Ruiz-Rosa v. Rullan, 485 F.3d at 156; Farmer v. Brennan, 511 U.S. 825, 837 (1994).[28]  Negligent care or "even malpractice does not give rise to a constitutional claim; rather, the treatment provided must have been so inadequate as 'to constitute "an unnecessary and wanton infliction of pain" or to be "repugnant to the conscience of mankind."'" Leavitt v. Correctional Medical Services, Inc., 645 F.3d at 497 (quoting Estelle v. Gamble, 429 U.S. 97, 105-106 (1976)) (citation omitted); see also Kosilek v. Spencer, 774 F.3d at 87 ("medical imprudence—without more—is insufficient to

---

[28]  This court set out the Eighth Amendment deliberate indifference standard for medical claims in the March 2015 Report and Recommendation.  For ease of reference, the standard, which has not materially changed, is repeated here.

establish an Eighth Amendment violation").

A "wanton disregard" to a prisoner's needs requires a disregard "akin to criminal recklessness, requiring consciousness of '"impending harm, easily preventable."'" Kosilek v. Spencer, 774 F.3d at 83 (quoting Watson v. Caton, 984 F.2d 537, 540 (1st Cir. 1993)). "[A] deliberate intent to harm is not required," however, because it is enough "to show a wanton disregard sufficiently evidenced 'by denial, delay, or interference with prescribed health care.'" Battista v. Clarke, 645 F.3d 449, 453 (1st Cir. 2011) (quoting DesRosiers v. Moran, 949 F.2d 15, 19 (1st Cir. 1991)).

A prison official is not deliberately indifferent if he responds "reasonably to the risk." Burrell v. Hampshire County, 307 F.3d 1, 7 (1st Cir. 2002). A disagreement about an appropriate course of treatment therefore does not amount to deliberate indifference. See Feeney v. Correctional Medical Services, Inc., 464 F.3d 158, 162 (1st Cir. 2006) ("when a plaintiff's 'allegations simply reflect a disagreement on the appropriate course of treatment, such a dispute with an exercise of professional judgment may present a colorable claim of negligence, but it falls short of alleging a constitutional violation'") (internal brackets omitted). Hence, courts consistently refuse "'to create constitutional claims out of disagreements between prisoners and doctors about the proper course of a prisoner's medical treatment, or to conclude that

simple medical malpractice rises to the level of cruel and unusual punishment.'" Kosilek v. Spencer, 774 F.3d at 83 (quoting Watson v. Caton, 984 F.2d at 540, in parenthetical). Conversely, deliberate indifference may exist "'by the denial of needed care as punishment and by decisions about medical care made recklessly with "actual knowledge of impending harm, easily preventable."'" Leavitt v. Correctional Medical Services, Inc., 645 F.3d at 497 (quoting Ruiz-Rosa, 485 F.3d at 156).

Assuming for purposes of argument only that plaintiff's hepatitis C and cirrhosis are serious medical needs, there is a dearth of evidence that either Riendeau or Nickl acted with the necessary deliberate indifference to those needs. In 2003 and 2004, plaintiff developed vision changes that precluded treatment with "peg-intron" or "Peg Interferon." (Docket Entry # 101-4, p. 2) (Docket Entry # 1, ¶ 6). The medical record contains numerous references to the fact that plaintiff "did not tolerate interferon therapy" and "developed retinal changes" when he received the treatment in 2003 and 2004. (Docket Entry # 101-4, p. 2); (Docket Entry # 101-2, p. 12) (Docket Entry # 101-7, pp. 2, 3) (Docket Entry # 1-2, p. 13) (Docket Entry # 1, ¶ 6). The drug regimens for boceprevir and telaprevir, approved by the FDA in 2011, required the use of "peginterferon alfa" and ribavirin.[29] (Docket Entry # 94, App. 52, 54).

In July 2012, Riendeau denied plaintiff's July 1, 2012

---

[29] In contrast, the Rule 12(c) record does not include the information that the drug protocol for boceprevir and telaprevir included "peginterferon alfa" and ribavirin.

44

grievance requesting a biopsy, the initiation of the process to obtain a liver transplant and alternative hepatitis C treatment. She deemed his treatment "appropriate" and that he would be receiving an MRI to evaluate his liver and "determine if a biopsy is indicated." (Docket Entry # 101-5, p. 3). At the time, the medical record included references to plaintiff's inability to tolerate "peg-intron" or "interferon and ribavirin therapy." (Docket Entry # 101-4, p. 2); (Docket Entry # 101-2, p. 12) (Docket Entry # 101-7, pp. 2, 3) (Docket Entry # 1-2, p. 13). It also included plaintiff's recent March 2012 visit and assessment by the Chief of the Division of Transplant Surgery at Tufts and other members of his team. Dr. Rohrer noted plaintiff's inability to tolerate interferon therapy and the existence of the 1.5 centimeter lesion and another lesion. He explained that the lesion needed to grow to two centimeters to make a decision regarding a liver transplant.

When Riendeau denied the grievance, the record also included Dantonio's April 2012 extensive documentation of plaintiff's hepatitis C treatment, including the management of his fluid overload with diuretic therapy, his HCC, his history of cirrhosis and his current symptoms. In early May 2012, plaintiff had a four phase CT scan of his pelvis and abdomen. On May 17, 2012, multiple providers saw plaintiff at the UMass clinic and three radiologists reviewed the CT scan. The team decided "to proceed with an MRI to further characterize the lesion" and, recognizing plaintiff's hepatitis C with cirrhosis and "decompensating liver

disease," did not have "plans currently for hep C treatment." (Docket Entry # 1-2, pp. 17-18).

Plaintiff had the MRI in August 2012.   (Docket Entry # 101-3).   In November 2012, he underwent the FNA biopsy and radio frequency ablation.   On December 28, 2012, plaintiff had a three phase CT scan of his pelvis and abdomen which showed a treated lesion and no signs of residual disease.   (Docket Entry # 1-4, pp. 9, 11-12).   On January 31, 2013, plaintiff was seen again in the UMass clinic and had a follow-up appointment with oncology. (Docket Entry # 1-4, pp. 9, 11).   After examining plaintiff, Dr. Switzer recommended "active surveillance alone with repeat imaging in 3 months after" the December 28, 2012 CT scan. (Docket Entry # 1-4, p. 12).   The UMass clinic note similarly reflects continued "surveillance" of plaintiff's condition and "imaging in 3 months after the 12/28/2012 imaging."   (Docket Entry # 1-4, p. 10).

In March 2013, plaintiff was seen at Lemuel Shattuck.   The discharge summary, initialed by Nasuti, includes the past history of plaintiff's treatment "with interferon and ribavirin which was discontinued for retinal changes."   (Docket Entry # 101-3, p. 3).

In July 2013, MPCH began providing the medical services to OCCC inmates previously provided by UMCH.   (Docket Entry # 33-1, p. 2).   Riendeau left OCCC when MPCH outbid UMCH for the contract.   (Docket Entry # 1, ¶ 20).

Overall, although plaintiff asked Riendeau for a liver biopsy, a liver transplant and alternative medication to treat

his hepatitis C, her responses were reasonable at the time of the denial in July 2012.  At that time, plaintiff's liver condition had been constantly and consistently monitored through consultations and testing.  His MELD score, weight and later the small size of the lesion in his liver counseled against his candidacy for a liver transplant.  Medical records reflecting his negative response to "interferon" or "peg-intron" and ribavirin provided a reasonable basis to deny treatment with boceprevir and telaprevir.  (Docket Entry # 101-4, p. 2); (Docket Entry # 101-2, p. 12) (Docket Entry # 101-7, pp. 2, 3) (Docket Entry # 1-2, p. 13).

Nickl's limited involvement in the alleged misconduct arises from Weiner forwarding plaintiff's February 27, 2013 appeal letter to Nickl.  (Docket Entry # 1-4, p. 7) (Docket Entry # 1, ¶ 17).  The letter complained about the confiscation of plaintiff's medications from his cell and that Riendeau was "play[ing] a game with [plaintiff's] KOP meds."  (Docket Entry # 1-4, p. 6).

Meanwhile, Riendeau's insistence that plaintiff obtain his skin medications in the medication line as opposed to retain them in his cell fails to withstand summary judgment on both the objective and subjective prongs of the Eighth Amendment.  As to the former, there is no showing that the skin rashes, skin tears, areas of hyperpigmentation and subcutaneous skin nodules (Docket Entry # 101-7, p. 6) (Docket Entry # 102-2, p. 18) constituted a serious medical need for which plaintiff received inadequate treatment.  <u>See</u> <u>Kosilek v. Spencer</u>, 774 F.3d at 85 (objective

47

prong requires showing that plaintiff "has a serious medical need
for which she has received inadequate treatment" and there is "no
Eighth Amendment violation where the prisoner failed to 'present
any evidence of a serious medical need that has gone unmet'")
(quoting Estelle v. Gamble, 429 U.S. at 106, in parenthetical)
(internal brackets omitted).  Even accepting that plaintiff has a
"weak physical constitution" (Docket Entry # 1, ¶ 15), plaintiff
could still receive medications for the skin conditions by
waiting in the medication line.  Where there is a choice between
two medical treatments, such as receiving medication in a
medication line or having it in a cell, the Eighth Amendment does
not require that UMCH medical providers adopt the more
compassionate option.  See Kosilek v. Spencer, 774 F.3d at 90
("where two alternative courses of medical treatment exist, and
both alleviate negative effects within the boundaries of modern
medicine, it is not the place of our court to 'second guess
medical judgments' or to require that the DOC adopt the more
compassionate of two adequate options").

As to the subjective prong, Riendeau responded reasonably to
the risk of current and future serious harm by requiring
plaintiff to obtain the medications in the medication line.  In
fact, Nasuti recognized the need to "prevent overuse" of the skin
lotion[s].  (Docket Entry # 101-2, p. 18).  There is little or no
evidence that Riendeau wantonly disregarded an impending and
easily preventable harm to plaintiff or otherwise acted with a
deliberate indifference.

In sum, the decisions not to prescribe boceprevir and
telaprevir, to require that plaintiff obtain skin lotions and
creams in the medication line, to have plaintiff undergo an FNA
biopsy and not to order a liver transplant on the part of
Riendeau or, assuming her involvement, Nickl, considered
collectively did not contravene the objective prong of the Eighth
Amendment.   Lacking a genuine issue of material fact that
Riendeau or Nickl acted with deliberate indifference, summary
judgment in their favor on the section 1983 Eighth Amendment
claim is appropriate.

B.   Section 1983 Retaliation Claim

Riendeau and Nickl next move for summary judgment on the
section 1983 retaliation claim.   Plaintiff alleges that Riendeau
retaliated against him because of the complaint he made to the
Board of Registration.   (Docket Entry # 1, ¶ 15).   Riendeau and
Nickl submit that plaintiff fails to provide any evidence that
the confiscation of medication from his cell was based on
retaliatory intent.   They point out that the reason plaintiff had
to retrieve his medication through "the medication line was based
on his noncompliance with the KOP status" as opposed to any
retaliatory animus on the part of Riendeau.   (Docket Entry # 101,
§ III).

In order to set out a First Amendment retaliation claim, "a
prisoner-plaintiff must allege '1) he engaged in constitutionally
protected conduct, 2) prison officials took adverse action
against him, 3) with the intent to retaliate against him for

49

engaging in the constitutionally protected conduct and 4) he would not have suffered the adverse action "but for" the prison officials' retaliatory motive.'" Hudson v. MacEachern, 94 F.Supp.3d 59, 68 (D.Mass. 2015); accord Niemic v. UMass Correctional Health, 89 F.Supp.3d 193, 211 (D.Mass. 2015) (stating same elements in context of First Amendment retaliation claim against inmate for filing medical grievances).  A prima facie case of retaliation requires the plaintiff inmate "to show that he engaged in a protected activity, that the state took an adverse action against him, and that there is a causal link between the former and the latter." Hannon v. Beard, 645 F.3d 45, 48 (1st Cir. 2011).  To avoid summary judgment, it is incumbent upon plaintiff to "furnish a factual basis to support a reasonable inference of a retaliatory animus." Id. at 50.  The First Circuit in Hannon affirmed summary judgment on Hannon's claim that prison officials transferred him to another prison in retaliation for exercising his First Amendment rights because the record was insufficient "to contradict the defendant's stated (non-retaliatory) reason for the transfer." Id. at 47, 50-51.

The evidence plaintiff cites to establish retaliation consists of his complaint to the Registration Board, correspondence between plaintiff and the Registration Board (Docket Entry # 1-3, pp. 2-8), the December 21, 2012 and February 18, 2013 grievances plaintiff filed on the Inmate Medical Grievance and Appeal Form and Riendeau's and other responses related thereto (Docket Entry # 1-4, pp. 1-5, 7-8).  (Docket

50

Entry # 1, ¶¶ 14-15, 17, 19).  Assuming the existence of
protected activity and that plaintiff otherwise establishes a
prima facie case given the temporal proximity between plaintiff's
complaints (Docket Entry # 1-3, pp. 2, 3 7, 8, 12) and Riendeau's
subsequent reiteration to plaintiff that he must obtain his
medication from the medication line (Docket Entry # 101-5, p. 8),
he fails to show a sufficient retaliatory animus on the part of
Riendeau.  Moreover, he fails to provide evidence, direct or
circumstantial, to refute or contradict the non-retaliatory
reason of requiring him to obtain his medications in the
medication line to avoid overuse (Docket Entry # 102-2, p. 18)
and/or the non-retaliatory reason that a KOP audit found
plaintiff noncompliant (Docket Entry # 101-5, p. 11).  Like the
plaintiff in <u>Hannon</u>, plaintiff relies on hearsay and statements
made without personal knowledge.  <u>See</u> <u>id.</u> at 49-51 & n.4.

　　　For example, Riendeau and Nickl correctly point out that
plaintiff lacks personal knowledge that Riendeau ordered Berg to
confiscate his medications.  (Docket Entry # 101, p. 12) (citing
Docket Entry # 60, p. 13, fn. 10).  Plaintiff's additional
averment that Berg asked another officer to confiscate
plaintiff's medications from his cell or Riendeau's statements to
Berg to harass plaintiff (Docket Entry # 1, ¶¶ 15, 16) are
hearsay.  <u>See</u> <u>id.</u> at 45, 49 (inmate's affidavit that two
different corrections officials told him that defendant ordered
his transfer because of his litigiousness was hearsay); <u>see also</u>
<u>Bhatti v. Trustees of Boston University</u>, 659 F.3d 64, 71 (1st

Cir. 2011) (Bhatti's recitation of coworkers' out-of-court statements about scheduling disparities was "inadmissible hearsay"); see generally LeBaron v. Spencer, 527 Fed. Appx. 25, 32 (1st Cir. 2013) ("because 'running a prison system is a difficult enterprise' and" prisoner retaliation claims "are 'easily fabricated and pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration,' such claims must be based on facts" as opposed to "'speculation and surmise'") (unpublished). Likewise, the statements in the grievances about what other nurses who are not parties to these proceedings said to plaintiff are hearsay. See Bennett v. Saint-Gobain Corp., 507 F.3d at 29 (unsworn grievances referencing discriminatory remarks made by plaintiff's boss to another employee was hearsay within hearsay).

At most, the summary judgment evidence includes the additional averment by plaintiff that, when he went to the medication window, he could not obtain his medications. He also presumably has personal knowledge that his KOP medications were no longer in his cell. (Docket Entry # 1, ¶¶ 15, 16). In particular, during management or staff access hours, plaintiff asked Riendeau for the return of his medications. Thereafter, plaintiff received his medications at "the med window." (Docket Entry # 1, ¶ 16). The next day, however, his medications were no longer in his cell. (Docket Entry # 1, ¶ 16). Without more, the summary judgment record fails to provide a reasonable inference that Riendeau acted with a retaliatory animus. Riendeau and

Nickl's argument that there is no evidence of retaliatory intent is well taken.  Summary judgment on the section 1983 retaliation claim is warranted.[30]

## IV.  State Law Claims

As a final argument, Riendeau and Nickl rely on their immunity under the MTCA to obtain summary judgment on the state law claims.  They maintain that UMCH, a public employer, is an arm of the state and that they acted within the scope of their employment as UMCH employees.  Accordingly, they are purportedly "immune from negligence claims" under the MTCA.  (Docket Entry # 101, § V).

Under the MTCA, "no . . . public employee . . . shall be liable for any injury or loss of property or personal injury . . . caused by his negligent or wrongful act or omission while acting within the scope of his office or employment."  Mass. Gen. Laws ch. 258, § 2.  The statute therefore immunizes public employees from liability for their negligent or wrongful acts committed while acting within the scope of their employment.  See Caisse v. DuBois, 346 F.3d 213, 218 (1st Cir. 2003) ("Caisse's

---

[30]  It is therefore not necessary to address Riendeau and Nickl's PLRA exhaustion arguments regarding the section 1983 Eighth Amendment and retaliation claims.  See Ramos v. Patnaude, 640 F.3d 485, 488 (1st Cir. 2011) (bypassing PLRA exhaustion under 42 U.S.C. § 1997e(a) "because it is not jurisdictional").  Riendeau and Nickl's argument that plaintif fails to exhaust his state law claims under section 38F (Docket Entry # 101, § IV) does not warrant summary judgment.  For reasons set out in the prior Report and Recommendation (Docket Entry # 60, p. 30), it is a genuinely disputed material fact as to whether plaintiff's medical condition and health fell within the statute's exception for "exigent circumstances."

negligence claims against the Department of Corrections defendants in their individual capacities are barred because the Tort Claims Act shields public employees from personal liability for negligent conduct"). Conversely, section ten exempts public employees from the immunity in section two for claims arising out of intentional torts thus rendering them potentially liable for an intentional tort. See McNamara v. Honeyman, 546 N.E.2d 139, 142 (Mass. 1989) ("[s]ection 10, which provides for exemptions from operation of § 2, among others, states in pertinent part that a public employee shall *not* be immune from 'any claim arising out of an intentional tort'"); Spring v. Geriatric Authority of Holyoke, 475 N.E.2d 727, 735 (Mass. 1985) ("[w]hile public employers . . . may not be held liable for intentional torts committed by their employees, the employees may be personally liable for any harm they have caused").

The determinative question in assessing whether an individual is a public employee within the meaning of the MTCA is whether the individual is "subject to the direction and control of a public employer." Smith v. Steinberg, 481 N.E.2d 1344, 1346 (Mass. 1985); see also Mass. Gen. Laws ch. 258, § 1 (defining "public employee" as an "employee[] of any public employer"); McNamara v. Honeyman, 546 N.E.2d at 142 (test to determine whether "individual is a public employee is the same as that used to establish 'whether an agent is a servant for whose negligent acts a principal may be liable under the common law doctrine of respondeat superior'"); Bianchi v. Bartlett, 2011 WL 1326639, at

54

*10 (D.Mass. Mar. 31, 2011).

The MTCA defines a "public employer" as "any department, office, commission, committee, council, board, division, bureau, institution, agency or authority thereof."  Mass. Gen. Laws ch. 258, § 1.  UMCH, "the name of a business operation," is not a separate corporate entity from the University of Massachusetts Medical School ("UMass Medical School").  (Docket Entry # 27-1). Individuals who provide medical services and work for UMCH are employees of the UMass Medical School.  (Docket Entry # 27-1). The UMass Medical School approved and entered into any contract that names or refers to UMCH.  (Docket Entry # 27-1).  The facts as well as the law, see McNamara v. Honeyman, 546 N.E.2d at 142 (University of Massachusetts, including UMass Medical School, is a public employer under MTCA), therefore establish that the UMass Medical School (and therefore UMCH) is a "public employer" within the meaning of the MTCA.

The issue thus reduces to whether Riendeau and Nickl were subject to the direction and control of UMCH, a public employer. "Whether an individual is a public employee is a question of fact."  Williams v. Hartman, 597 N.E.2d 1024, 1026 (Mass. 1992) In the case of a physician, the court "examine[s] whether a public employer directs and controls the physician's treatment of the patient."  Id.; see McNamara v. Honeyman, 546 N.E.2d at 142 ("[w]hile physicians exercise independent judgment, a physician can still be deemed a servant where the principal controls the details of the physician's activities").  To state the obvious,

55

neither Riendeau nor Nickl are physicians.  Nurses, such as
Riendeau, necessarily "'function within the hierarchy of the
[facilities] in which they work[, and they] are not free to
exercise their independent judgment to the degree that doctors
[are]." Bianchi v. Bartlett, 2011 WL 1326639, at *10 (quoting
Tomaccio v. Hardy, 2007 WL 1630961, at * 4 (Mass.Super. May 25,
2007)).

That said, the degree to which UMCH or its physicians
controlled and oversaw the medical care Riendeau provided to
plaintiff as well as the degree and control UMCH exercised over
her work as HSA in adjudicating medical grievances, such as the
July 1, 2012 grievance (Docket Entry # 101-5, p. 3) and the
February 27, 2013 grievance (Docket Entry # 1-4, pp. 3, 4) at
issue in this case, is not in the record.  See Kelley v. Rossi,
481 N.E.2d 1340, 1343-44 (Mass. 1985) ("[b]ecause the plaintiff's
claim arises from the alleged negligence of the doctor in the
emergency room, we must focus on those facts tending to show
that, while working in the hospital's emergency room, the doctor
was not subject to the direction and control of the city").
There is no indication of the number of hours Riendeau and Nickl
worked, the control over their schedule, the discretion afforded
Riendeau or Nickl in exercising the duties at issue in this case
and the rules and policies of UMCH.  Cf. Bianchi v. Bartlett,
2011 WL 1326639, at *10 (examining similar factors in determining
if UMCH nurse was public employee and concluding that nurse was
public employee on summary judgment); see also Kelley v. Rossi,

56

481 N.E.2d at 1343-44 (examining various circumstances in determining whether physician was employee of city hospital); Florio v. Kennedy, 464 N.E.2d 1373, 1374-75 (Mass.App.Ct. 1984). Thus, in contrast to the depth and detail of the record before the court in Bianchi v. Bartlett, 2011 WL 1326639, at *1, 10, the record here fails to elucidate the relationship between UMCH and Riendeau or Nickl and, more specifically, the degree and level of direction and control UMCH exercised over Riendeau and Nickl with respect to the alleged misconduct at issue. Riendeau and Nickl bear the underlying "burden of proof on the issue of the entitlement to immunity as a public employee." Tomaccio v. Hardy, 2007 WL 1630961, at *3. The fact that the complaint states that Riendeau worked "under the auspices" of UMCH does not, without more, establish that she was under the direction and control of UMCH in requiring plaintiff to wait in the medication line and in rejecting his request for alternative hepatitis C treatment. Cf. Jaundoo v. Clarke, 690 F.Supp.2d 20, 29 (D.Mass. 2010) (statement in complaint "that at all relevant times, Berry 'was acting within the scope of her employment as an employee of [UMCH]'" established that "Berry was a public employee at the time of the events giving rise to this action") (emphasis added). Similarly, the complaint's averment that Nickl worked as senior director of programs at UMCH does not, without more, establish that she was a public employee in the context of Weiner's alleged "palm[ing] off" of the February 27, 2013 appeal to Nickl. (Docket Entry # 1, ¶ 17). Riendeau and Nickl therefore fail to

establish the absence of a genuine issue of material fact that Riendeau and Nickl were under the direction and control of UMCH.[31]  Based on the arguments presented, the state law claims are not subject to summary judgment at this point in time.

III.  MPCH Defendants' Rule 12(c) Motion

The MPCH defendants move for judgment on the pleadings on the MTCA and article 26 claims against them.  (Docket Entry # 97).  Plaintiff opposes the motion.  (Docket Entry # 116).

STANDARD OF REVIEW

The applicable standard of review for a motion under Rule 12(c) "is identical to the standard of review for motions to dismiss for failure to state a claim under Rule 12(b)(6)." Jardin De Las Catalinas Ltd. Partnership v. Joyner, 766 F.3d 127, 132 (1st Cir. 2014); Frappier v. Countrywide Home Loans, Inc., 750 F.3d 91, 96 (1st Cir.) ("standard of review of a motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) is the same as that for a motion to dismiss under Rule 12(b)(6)"), cert. denied, 135 S.Ct. 179 (2014).  Taking the facts in the complaint as true and drawing reasonable inferences in plaintiff's favor, Frappier v. Countrywide Home Loans, Inc., 750 F.3d at 96, the "complaint must contain factual allegations that 'raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true.'" Perez-Acevedo v. Rivero-Cubano, 520 F.3d 26, 29 (1st Cir. 2008)

---

[31]  Separately, it worth noting that the complaint may raise an intentional tort claim under the MTCA.

58

(quoting <u>Bell Atlantic v. Twombly</u>, 550 U.S. 544, 555 (2007), and setting out standard of review for Rule 12(c) motion); <u>see</u> <u>Downing v. Globe Direct LLC</u>, 682 F.3d 18, 22 (1st Cir. 2012) ("complaint must allege enough facts to state a claim to relief that is plausible on its face") (internal quotation marks omitted).  "'Rule 12(c) does not allow for any resolution of contested facts; rather, a court may enter judgment on the pleadings only if the uncontested and properly considered facts conclusively establish the movant's entitlement to a favorable judgment.'"  <u>Patrick v. Rivera-Lopez</u>, 708 F.3d 15, 18 (1st Cir. 2013).

A Rule 12(c) motion nonetheless differs from a Rule 12(b)(6) motion because "it implicates the pleadings as a whole."  <u>Aponte-Torres v. University of Puerto Rico</u>, 445 F.3d 50, 54-55 (1st Cir. 2006).  Filed after the close of the pleadings, a Rule 12(c) motion is "based solely on the factual allegations in the complaint and answer."  <u>NEPSK, Inc. v. Town of Houlton</u>, 283 F.3d 1, 8 (1st Cir. 2002).

As a result of the obligation to view the facts and reasonable inferences in favor of the nonmovant, however, "the court treats any allegations in the answer that contradict the complaint as false."  <u>Goodman v. Williams</u>, 287 F.Supp.2d 160, 161 (D.N.H. 2003); <u>accord</u> <u>Rimmer v. Colt Industries Operating Corporation</u>, 656 F.2d 323, 326 (8th Cir. 1981) (Rule 12(c) review assumes all "well pleaded factual allegations in Rimmer's amended complaint are true, and all contravening assertions in Colt's

answer are assumed to be false"); see Stanton v. Larsh, 239 F.2d 104, 106 (5th Cir. 1957) (on Rule 12(c) motion, facts in "answer are taken as true only where and to the extent that they have not been denied or do not conflict with those of the complaint").

Here, the answer of the MPCH defendants admits a fact that the complaint does not include.  Specifically, in response to paragraph six, "The MPCH Defendants admit that Plaintiff has a specific viral mutation that predicts resistance to protease inhibitors." (Docket Entry # 84, ¶ 6).  Paragraph six in the complaint, however, only states that:

> Plaintiff was treated by prison health providers in 2006 or 2007 with PEG interferon.  Treatment was stopped due to plaintiff having retina problems.  No alternative treatment has been offered.

(Docket Entry # 6, ¶ 6).  This fact (Docket Entry # 84, ¶ 6) is not in the complaint and, construing the complaint in plaintiff's favor, is contradicted by the facts and reasonable inferences in the complaint.  It is not part of the Rule 12(c) record.

Subject to certain narrow exceptions and absent a conversion of the Rule 12(c) motion to a summary judgment motion under the procedure set forth in Rule 12(d), the court's review is confined to the complaint and the answer.  As with Rule 12(b)(6), exceptions exist that allow consideration of "documents incorporated by reference into the complaint, matters of public record, and facts susceptible to judicial notice." Grajales v. Puerto Rico Ports Auth., 682 F.3d 40, 44 (1st Cir. 2012).

Here, the MPCH defendants do not set out the facts in the

complaint.  Rather, they rely on certain facts and legal

conclusions or intermingled factual and legal conclusions set out

in the Report and Recommendation adjudicating the MPCH's summary

judgment motion.[32]  The MPCH defendants maintain that this court

can take judicial notice of these findings.

A court may take judicial notice of "adjudicative facts."

Fed.R.Evid. 201.  "Adjudicative facts are "'simply the facts of

the particular case.'"  F.R.E. 201, Advisory Committee Notes;

Getty Petroleum Mktg., Inc. v. Capital Terminal Co., 391 F.3d

312, 322 n.12 (1st Cir. 2004); see Gebremichael v. I.N.S., 10

---

[32] The findings are as follows:

1. In July 2013, the Massachusetts Department of Correction
contracted Defendant Massachusetts Partnership for
Correctional Healthcare to provide medical services to
inmates at Old Colony Correctional Center. (R&R, Doc.60,
pg.6).

2. The MPCH Defendants failure to treat Plaintiff's
Hepatitis C with Boceprevir and Telaprevir was reasonable
because Plaintiff has a diagnosed viral mutation that
predicts resistance to both of these medications. (R&R,
Doc.60, pg.33).

3. "During the past year, medical personnel have actively
monitored [Plaintiff's] hepatitis C with lab tests and
consultations." (R&R, Doc.60, pg.33).

4. "Considering the entire treatment MPCH afforded to
plaintiff beginning in July 2013, such conduct fails to
evidence a deliberate indifference to plaintiff's hepatitis
C or any denied or delayed care as a punishment." (R&R, Doc.
60, pgs. 33-34).

5. Plaintiff cannot maintain a claim against the MPCH
Defendants under Section 1983 "because plaintiff cannot show
that the medical treatment provided by defendants amounted
to deliberate indifference under the Eighth Amendment to the
United States Constitution." (Order, Doc.67, pg.2).

(Docket Entry # 98).

F.3d 28, 37 n.25 (1st Cir. 1993) (adjudicative facts "'usually
answer the questions of who did what, where, when, how, why, with
what motive or intent'"). As defined in the rule, an
"adjudicative fact" is a fact "not subject to reasonable dispute
because it: (1) is generally known within the trial court's
territorial jurisdiction; or (2) can be accurately and readily
determined from sources whose accuracy cannot be reasonably
questioned." Fed.R.Evid. 201(b). To provide an example of a
fact subject to reasonable dispute, the First Circuit in
Prescott v. Higgins, 538 F.3d 32 (1st Cir. 2008), upheld the
lower court's refusal to take judicial notice of statistics that
showed a disparate impact in a different case because the
validity of the statistics was "at issue" in that case and
therefore not beyond "reasonable dispute" within the meaning of
Fed.R.Evid. 201(b) ("Rule 201"). Id. at 41. As expressed in the
advisory committee notes, "A high degree of indisputability is
the essential prerequisite" of an adjudicative fact. Fed.R.Evid.
201, advisory committee notes.

A court may also take judicial notice of judicial
decisions.[33] Berríos-Romero v. Estado Libre Asociado de Puerto

---

[33] A judicial decision or opinion is also subject to
consideration because it falls under the exception for matters of
public record. See Giragosian v. Ryan, 547 F.3d 59, 66 (1st Cir.
2008) (court may consider matters of public record when deciding
Rule 12(b)(6) motion and such matters "ordinarily include
'documents from prior state court adjudications'"); accord San
Geronimo Caribe Project, Inc. v. Acevedo-Vila, 687 F.3d 465, 471
(1st Cir. 2012) (considering "various state decisions of public
record giving rise to [the] claim" in reviewing lower court's
Rule 12(b)(6) dismissal).

Rico, 641 F.3d 24, 27 (1st Cir. 2011) (taking judicial notice of decision by Puerto Rican Court of Appeals and noting that "decision of a sister court is a proper matter of judicial notice").  This rule allows a court to take judicial notice of its own orders.[34]  See In re Papatones, 143 F.3d 623, 624 n.3 (1st Cir. 1998) ("'court may take judicial notice of its own orders'") (dicta quoting another case in parenthetical); see Tal v. Hogan, 453 F.3d 1244, 1265 (10th Cir. 2006) (court may "'take judicial notice of its own files and records'").  Taking judicial notice of a decision in another court, however, is not the same as taking judicial notice of a fact within the decision.  "Thus, even when a copy of a judicial decision is placed in the record, it is not 'evidence' nor is it fact." Berrios-Romero v. Estado Libre Asociado de Puerto Rico, 641 F.3d at 27; see also Jonas v. Gold, 2015 WL 5573963, at *4 (3rd Cir. Sept. 23, 2015) ("District Court was entitled to take judicial notice of prior opinions to establish the procedural history of the case" and citing case that stated, "but not for truth of facts recited therein"); Jergens v. Ohio Dept. of Rehab. and Corrections Adult Parole Auth., 492 Fed. Appx. 567, 569 (6th Cir. 2012) (unpublished) ("[a]lthough we are certainly permitted to take judicial notice of court records and judicial proceedings under some circumstances, such as to confirm the fact of filing, we may not do so in order to discern the truth of the facts asserted within

---

[34]  The MPCH defendants do not argue and therefore waive that the summary judgment ruling constitutes the law of the case.

that filing") (citation omitted); Winget v. JP Morgan Chase Bank, N.A., 537 F.3d 565, 576 (6th Cir. 2008) ("[a]lthough the district court quotes a paragraph from Winget's objection to the Sale Order, the district court did so *not* in a way that took judicial notice of the facts in the paragraph, but rather in a way that took notice that Winget made an objection to the Sale Order") (emphasis added); S. Cross Overseas Agencies, Inc. v. Wah Kwong Ship. Group Ltd., 181 F.3d 410, 426 (3rd Cir. 1999); Sternkopf v. White Plains Hosp., 2015 WL 5692183, at *5 (S.D.N.Y. Sept. 25, 2015); Oveissi v. Islamic Republic of Iran, 879 F.Supp.2d 44, 50 (D.D.C. 2012) ("it cannot be said that" factual findings in judicial opinion in related proceeding "are 'not subject to reasonable dispute'"). In addition, although a court may take judicial notice of a decision in another court, whether the court should take judicial notice presents a separate question. See Berrios-Romero v. Estado Libre Asociado de Puerto Rico, 641 F.3d at 27 (recognizing principle of taking judicial notice of decision by sister court and then examining question of "whether we should take judicial notice here" due to defense counsel's failure to comply with local rule).

Examining the five findings that the MPCH defendants identify, taking judicial notice of the first fact is not necessary. The complaint, which is part of the Rule 12(c) record, already states that MPCH outbid UMCH for the contract in 2013. (Docket Entry # 1, ¶ 20).

With respect to the third fact, taking judicial notice does

not inevitably lead to a Rule 12(c) judgment on the pleadings. The fact emanated from a statement in Dr. Hameed's February 2015 affidavit that, "For the past year, [plaintiff's] condition has been monitored with multiple lab tests and chronic disease consultations with medical professionals outside of OCCC." (Docket Entry # 56-1, ¶ 7) (Docket Entry # 60, pp. 10, 33).  The time period of such monitoring and consultations was therefore from February 2014 to February 2015.  The determinative time period regarding the MPCH defendants' misconduct, if any, began in 2013 when MPCH outbid UMCH for the contract to provide medical services to OCCC inmates.[35]

Taking judicial notice of the fourth and fifth findings as well as the law in the second finding is less problematic.  The Report and Recommendation adjudicated the merits of the MPCH defendants' summary judgment motion on the Eighth Amendment deliberate indifference claim and each proposed finding entails this court's legal conclusion that the medical care provided by the MPCH defendants was reasonable or that deliberate indifference was absent.  The relevant legal conclusions appear on pages 33 and 34, which then formed the basis for the

---

[35] The Rule 12(c) record fails to contain any medical records from February 1, 2013, i.e., after the January 31, 2013 visit to UMass Memorial, to February 2014, when plaintiff filed the complaint.  (Docket Entry # 1, ¶ 20).  Moreover, the complaint states that plaintiff has not received treatment for his hepatitis C or any alternative medications to treat the condition.  The July 23, 2014 Boston Medical Center record (Docket Entry # 116, pp. 10-13) is also not part of the Rule 12(c) record.  It is not an exhibit attached to the complaint and does not fall within any recognized exception that would allow its consideration.

recommendation to allow the MPCH defendants' summary judgment on the section 1983 Eighth Amendment claim. (Docket Entry # 60, pp. 33-34, 44). The fifth proposed finding consists of the district judge's acceptance and adoption of this court's determination "that summary judgment should be entered" for the MPCH defendants "because plaintiff cannot show that the medical treatment" by the MPCH defendants "amounted to deliberate indifference." (Docket Entry # 67). Given the standard of review on summary judgment, these proposed findings of law determined there was no genuine issue of material fact that the medical treatment provided by the MPCH defendants amounted to deliberate difference or that any delayed or denied care constituted the denial or delay of care inflicted as a punishment. (Docket Entry # 60, pp. 4-6, 33-34, 44); see generally Iacobucci v. Boulter, 193 F.3d 14, 19 (1st Cir. 1999) ("trial court ordinarily is the best expositor of its own orders").

The second proposed finding also includes a fact, namely, that, "Plaintiff has a diagnosed viral mutation that predicts resistence to both" boceprevir and telaprevir. (Docket Entry # 60, pp. 10, 33). This statement was a disputed fact at issue in the summary judgment record. As such, it is not an "adjudicative fact" within the meaning of Rule 201(b). In addition and as explained above, taking judicial notice of disputed facts, as opposed to the law or procedural import of a judicial decision, is not appropriate. Here, at most, it is appropriate to take judicial notice of the law that, on summary judgment, the failure

to treat with boceprevir and telaprevir was a reasonable response
to the risk as opposed to deliberate indifference.  See
Berrios-Romero v. Estado Libre Asociado de Puerto Rico, 641 F.3d
at 27; see generally Kosilek v. Spencer, 774 F.3d at 83-84 (to
avoid liability, "prison administrators need only have 'responded
reasonably to the risk'").  Finally, even if this court took
judicial notice of this fact or the intermingled fact and law of
the entire proposed finding, it does not merit a Rule 12(c)
judgment on the pleadings because the Rule 12(c) record also
shows no medical treatment for more than year (February 1, 2013
to February 19, 2014)[36] notwithstanding the known risk that
plaintiff could develop HCC and required active monitoring.
Moreover, accepting the entirety of the first proposed finding
that MPCH contracted with the DOC "[i]n July 2013" (Docket Entry
# 98, p. 2), as opposed to simply "2013" (Docket Entry # 1, ¶
20), the fact remains that when MPCH took over the contract in
July 2013, there had been no treatment since January 31, 2013.

     In sum, this court will take judicial notice of the law in
the second, fourth and fifth findings which thus establishes
there was no genuine issue of material fact that the medical
treatment the MPCH defendants provided amounted to deliberate
indifference under the Eighth Amendment.  Taking judicial notice,
however, does not inevitably lead to a Rule 12(c) judgment on the
pleadings because Rule 12(c) uses a different and far more
plaintiff favorable standard in viewing the record.  Thus, taking

---

[36]  Plaintiff signed the complaint on February 19, 2014.

judicial notice establishes an absence of genuinely disputed material facts but it does not necessarily establish that the Eighth Amendment claim is not plausible based on the Rule 12(c) record.   Further, as set out below, the Rule 12(c) record, construed in plaintiff's favor, shows that plaintiff received ample treatment for his suspected liver cancer and lesion up to January 31, 2013 but no alternative treatment for his hepatitis C after the discontinuance of interferon therapy and no treatment or monitoring of the known and serious risk that plaintiff would develop HCC after January 31, 2013 and up to the time plaintiff filed the complaint in February 2014.[37]

## FACTUAL BACKGROUND

In addition to the foregoing, judicially noticed findings, the Rule 12(c) record, taken from the facts in the complaint and attached documents during the relevant time period, includes the following.   In 2013 and prior thereto, UMCH provided medical services to inmates at OCCC, including plaintiff.   "At some point in 2013[,]" MPCH took over and began providing medical services to OCCC inmates.   (Docket Entry # 1, ¶ 20).

Plaintiff has a history of hepatitis C and is confined to a wheelchair.   (Docket Entry ## 1-2, 1-4).   By 2007, he had received "PEG Interferon" and ribavirin therapy.   The treatment ended because he developed retinal changes.   (Docket Entry # 1, ¶ 6) (Docket Entry # 1-2, p. 13).

Neither UMCH nor MPCH medical providers provided plaintiff

---

[37]   See the previous footnote.

an alternative treatment for his hepatitis C.  (Docket Entry # 1, ¶ 6).  In May 2011, the FDA approved boceprevir and telaprevir to treat hepatitis C.[38]  (Docket Entry # 1, ¶ 8).  Plaintiff has not received these new medications.  (Docket Entry # 1, ¶ 8).

On May 11, 2012, plaintiff had a four phase CT scan of his pelvis and abdomen.  The radiology report showed "changes of advanced cirrhosis" and a liver mass that "should be considered as hepatocellular carcinoma unless proven otherwise." (Docket Entry # 1-2, p. 9).

On May 17, 2012, plaintiff had an outpatient oncology consultation with Venu G. Bathini, M.D. ("Dr. Bathini") at UMass Memorial "as a part of the multidisciplinary HCC Clinic at UMass." (Docket Entry # 1-2, pp. 10, 12).  The indication for the consultation was to assess plaintiff's "[c]hronic hepatitis C, cirrhosis and liver mass." (Docket Entry # 1-2, p. 10).  Dr. Bathini's note shows that a September 2008 CT scan initially revealed the liver mass.  Repeat CT scans in January 2009, February 2010 and March 2011 indicated "a stable hepatic lesion in the setting of hepatitis C and cirrhosis . . . that had not significantly grown in 5 years' time." (Docket Entry # 1-2, p. 10).  Dr. Bathini reviewed the imaging with three radiologists at a multidisciplinary conference.  Noting that "a biopsy may be aggressive and not needed," the multidisciplinary board adopted a "watch and wait philosophy" with "active surveillance" and

---

[38] As stated earlier, the Rule 12(c) record does not include the fact that these medications are taken with "peginterferon alfa" and ribavirin.  (Docket Entry # 94, App. 52, 54).

reimaging in three to six months.   (Docket Entry # 1-2, p. 12).

The UMass clinic note likewise reflects "the consensus opinion"

of the multidisciplinary team at the UMass clinic to obtain an

"MRI study of [the] liver lesion and[,] if still ambiguous and

not clearly a benign lesion, then" possibly "recommend proceeding

to a liver biopsy."   (Docket Entry # 1-2, p. 14).   The team had

"[n]o plans currently for hep C treatment."   (Docket Entry # 1-2,

p. 14).

In November 2012, plaintiff underwent the radio frequency

ablation of the lesion and "[t]he biopsy at that time showed just

an adenoma."   (Docket Entry # 1-4, p. 9).   On December 28, 2012,

he had a three phase CT scan of his abdomen and pelvis.   The scan

revealed no abnormalities except for "a large ablative cavity" in

the area where the lesion was ablated and a small hepatic lesion.

(Docket Entry # 1-4, p. 11).

On January 31, 2013, plaintiff was seen again at the UMass

clinic.   The clinic note states that, "As a patient with

cirrhosis, he is at risk for developing further HCC and will be

followed."   (Docket Entry # 1-4).   Accordingly, the

multidisciplinary group decided "to proceed with active

surveillance and a followup CT of the chest, abdomen and pelvis

in 3 months."   (Docket Entry # 1-4).   Thereafter and construing

the record in plaintiff's favor, there is no indication that

plaintiff received any treatment for his hepatitis C and

remaining lesion.

As noted above, MPCH began providing the medical services

70

for inmates at OCCC in 2013 or, at the latest, in July 2013. Caratazzola and Davenport also began working as HSAs at OCCC. (Docket Entry # 1).  Based on the Rule 12(c) record, after plaintiff's January 31, 2013 visit and examination by Dr. Switzer, plaintiff did not receive any treatment or alternative medications for his hepatitis C up until the time he filed the complaint in February 2014.  (Docket Entry # 1).  Drawing reasonable inferences, the MPCH defendants knew about the January 31, 2013 visit and the need for active surveillance with imaging of the lesion in or around March 28, 2013 and, absent signs any other disease, repeat imaging every six months.  (Docket Entry ## 1, 1-4).  Notwithstanding the MPCH defendants' awareness of plaintiff's condition, including the risk of developing further HCC, and the need for active monitoring, they failed to provide any treatment up to the time plaintiff filed the complaint in February 2014.

As to other or related medical conditions, plaintiff "has had DVT in the past" and experiences chronic lower back pain. (Docket Entry ## 1-2, 1-4).  His chief complaint at the May 17, 2012 visit and examination at UMass Memorial was swelling in the lower part of his left leg with redness.  (Docket Entry # 1-2, p. 13).  Plaintiff states he "has blood pooling up under his skin." (Docket Entry # 1, ¶ 10).  During the May 17, 2012 visit, an ultrasound of the leg on the same day did not show a blood clot. As a result of the "significant edema," dosages of plaintiff's diuretic medications were increased.  (Docket Entry # 1-2).  At

71

the time plaintiff filed the February 2014 complaint, his legs were "swollen-about three times normal girth." (Docket Entry # 1, ¶ 18).

DISCUSSION

A.  <u>Article 26 Claim</u>

The MPCH defendants seek a Rule 12(c) judgment on the pleadings on the article 26 of the Massachusetts Declaration of Rights Act claim because the record fails to show deliberate indifference.  They reason that plaintiff is not entitled to the treatment of his choice in the form of the alternative medications of boceprevir and telaprevir and that their refusal to treat him with these medications was reasonable because he had a diagnosed viral mutation that predicted his resistance to such treatment.  (Docket Entry # 98, pp. 4-7 & n.4).  They surmise that any delays in discovering acceptable medications was reasonable in light of the viral mutation.  They also maintain that they actively monitored plaintiff's medical condition with lab tests and outside consultations.  Finally, with respect to Nasuti, they submit that the complaint provides no facts to support that she "violated his rights." (Docket Entry # 98, n.4) (Docket Entry # 33, pp. 10-11).

Assuming dubitánte that Massachusetts courts would recognize a direct cause of action under article 26, <u>see</u> <u>Podgurski v. Dep't of Correction</u>, 2014 WL 4772218, at *7 (D.Mass. Sept. 23, 2014) ("'as a general proposition, a cause of action can, in certain circumstances, be brought directly under the Massachusetts

72

Declaration of Rights in the absence of a statutory vehicle for obtaining relief'"); but cf. Do Corp. v. Town of Stoughton, 2013 WL 6383035, at *13 (D.Mass. Dec. 6, 2013) ("[w]here, as here, a statutory vehicle exists under the Massachusetts Civil Rights Act, Mass. Gen. L. ch. 12, § 11H, to address the state law claim under the Declarations of Rights, there is no need to find a direct right of action under the Declaration of Rights"), article 26, like the Eighth Amendment, proscribes the infliction of "cruel and unusual punishments." Mass. Const. art. 26; U.S. Const. amend. VIII. "'The rights guaranteed under art. 26 are at least equally as broad as those guaranteed under the Eighth Amendment.'" Cryer v. Spencer, 2012 WL 892883, at *7 (D.Mass. Mar. 15, 2012) (quoting Michaud v. Sheriff of Essex County, 458 N.E.2d 702, 708 (Mass. 1983)) (brackets omitted). "A prisoner seeking relief under article 26 "must point to both (1) a condition or situation 'which poses a substantial risk of serious harm'; and (2) facts establishing that a prison official 'has knowledge of the situation and ignores it.'" Torres v. Commr. of Correction, 695 N.E.2d 200, 204 (Mass. 1998).

Here, plaintiff had a diagnosed medical condition of hepatitis C and cirrhosis of the liver. Having developed a lesion in the liver, he underwent radio frequency ablation for the lesion in November 2012. (Docket Entry # 1-4, p. 9). "[A]s a patient with cirrhosis," plaintiff had a continued risk of developing HCC and required active monitoring, as noted in the UMass clinic note for the January 31, 2013 visit. (Docket Entry

73

# 1-4, pp. 9-10).  Dr. Switzer's note for his January 31, 2013 examination of plaintiff similarly state that, "From a hepatic standpoint, this patient . . . should be continued to be followed regularly" with respect to his "hepatitis C and liver disease." (Docket Entry # 1-4, p. 12).

Notwithstanding this plausible substantial risk of serious harm, the MPCH defendants did not monitor or follow plaintiff's condition after outbidding UMCH for the contract in 2013 or, at the latest, in July 2013[39] thus providing a plausible basis that the MPCH defendants knew about the condition set out in the medical records and ignored it.[40]  No more is required to survive a Rule 12(c) challenge to the article 26 claim.  Judicially noticing the absence of genuinely disputed material facts that the MPCH defendants acted with deliberate indifference does not render the article 26 claim not plausible.  See DeGrandis v. Children's Hosp. Boston, 806 F.3d 13, 16 (1st Cir. 2015) (while "'complaint does not need "detailed factual allegations" to survive a motion to dismiss, a plaintiff's factual allegations "must be enough to raise a right to relief above the speculative level"'").  Viewing the record in plaintiff's favor and taking judicial notice of an absence of genuinely disputed material facts that the medical treatment the MPCH defendants provided

---

[39]  Because the record is construed in plaintiff's favor, this court construes the complaint's reference to "2013" (Docket Entry # 1, ¶ 20) as early 2013.

[40]  At the time MPCH took over the contract, the medical records, i.e., those in the Rule 12(c) record, showed no treatment after the January 31, 2013 UMass Memorial visit.

amounted to deliberate indifference fails to establish that the
facts are not *plausible* or do not rise above the speculative
level regarding the MPCH defendants' knowledge of the need to
actively monitor and provide medical treatment for plaintiff's
hepatitis C and cirrhosis, albeit not necessarily treatment in
the form of boceprevir and telaprevir.  The Rule 12(c) facts
plausibly show that the MPCH defendants ignored, without a
reasonable basis, that need and the plausible serious risk of
harm to plaintiff from receiving no medical care from February
2013 to February 2014.

Next, turning to the MPCH defendants' argument regarding
Nasuti, the record is devoid of any indication that she ignored
any medical condition of plaintiff's that posed a substantial
risk of serious harm.  The complaint identifies Nasuti as a nurse
practitioner at OCCC "under the auspices of" MPCH.  The complaint
additionally states that:

> It is believed by plaintiff that Shawna Nasuti is being
> prevented from prescribing alternative meds for plaintiff's
> hepatitis C by Davenport and Caratazzola, and if she were to
> testify to such, the plaintiff will drop the case against
> her . . . Shawna Nasuti is a Nurse Practitioner serving the
> role of a doctor in the prison.  Very often when she
> prescribes meds for an inmate the orders are cancelled by
> the HSA Davenport and Caratazzola - at the behest of MPCH.

(Docket Entry # 1, ¶¶ 20-21).  Plaintiff does not argue the
contrary.[41]

---

[41]  In opposing the Rule 12(c) motion, plaintiff asserts that
Nasuti, "unlike the other defendants, is not a sociopath.  She
actually attempted to offer treatment to prisoners like Dana.
She was routinely overruled by management" and "resigned from
MPCH . . .."  (Docket Entry # 116).

B.  <u>MTCA Liability</u>

The MPCH defendants next assert that they cannot be sued under the MTCA because MPCH is not a public employer.  They maintain that MPCH is a "private contractor" and therefore does not fall within the statute's definition of a "public employer." Mass. Gen. Laws ch. 258, § 1.  In presenting the argument, the MPCH defendants rely on the facts in the complaint and their answer.

Those facts show that in 2013, MPCH outbid UMCH and entered into a contract with the DOC to provide medical care to OCCC inmates.  Davenport and Caratazzola took over as HSAs for MPCH. Nasuti, Davenport and Caratazzola worked at OCCC under the auspices of MPCH.  (Docket Entry # 1, ¶¶ 2, 20, 21) (Docket Entry # 84, ¶¶ 2, 20).[42]

The MTCA defines a "public employer" as "any department, office, commission, committee, council, board, division, bureau, institution, agency or authority thereof."  Mass. Gen. Laws ch. 258, § 1.  By definition, the term "public employer" is "not a private contractor with any such public employer . . .."[43]  Mass.

---

[42]  The MPCH defendants do not identify any other relevant fact except that Berg, Nasuti, Caratazzola and Davenport were employees of MPCH.  (Docket Entry # 84, ¶ 2).  The complaint, however, only states that Nasuti, Caratazzola and Davenport worked at OCCC "under the auspices of" MPCH and identifies Berg as an "LPN," i.e., a licensed practical nurse.  (Docket Entry # 1, ¶¶ 2, 15).  In the event of a conflict between the complaint and the answer, the facts in the complaint govern.  The record does not further elucidate the relationship between MPCH and the DOC.

[43]  The MPCH defendants do not argue that MPCH is an "independent body politic" and therefore waive the issue for purposes of the

Gen. Laws ch. 258, § 1; <u>Fredette v. Respite H. of Fitchburg</u>, 1995
WL 809520, at *4 (Mass.Super. May 30, 1995) ("Commonwealth is not
a public employer of its private contractors, G.L.c. 258, § 1").

Assuming that the DOC is a public employer, the issue
reduces to whether the facts render it plausible that MPCH is not
a private contractor with the DOC.  The Rule 12(c) record does
not include the terms of the contract and the relationship
between MPCH and the DOC.  At best, the facts show that MPCH
employees provided medical care to OCCC inmates, including
plaintiff, and that MPCH had a contract with the DOC.  There is
no indication of the structure of MPCH or facts identifying the
entity that pays the salaries of the MPCH defendants, controls
their schedules or directs their duties.  Viewing the record in
plaintiff's favor, Berg and Nasuti worked at OCCC and Caratazzola
and Davenport oversaw health care services at the prison.  It is
also reasonable to infer that they were subject to the rules and
regulations of the DOC in effect at OCCC.  Overall, it remains
plausible that MPCH was not a private contractor separate and
apart from the DOC.

<u>CONCLUSION</u>

In accordance with the foregoing discussion, this court
**RECOMMENDS**[44] that:  (1) the MPCH defendants' motion for judgment

---

Rule 12(c) motion.  Mass. Gen. Laws ch. 258, § 1.

[44]  Any objections to this Report and Recommendation must be filed
with the Clerk of Court within 14 days of receipt of the Report
and Recommendation to which objection is made and the basis for
such objection.  Any party may respond to another party's
objections within 14 days after service of the objections.

on the pleadings (Docket Entry # 97) be **ALLOWED** as to Nasuti and otherwise **DENIED**; plaintiff's motion for relief from judgment (Docket Entry # 92) be **DENIED**; and Riendeau and Nickl's motion for summary judgment (Docket Entry # 99) be **ALLOWED** as to the section 1983 Eighth Amendment and retaliation claims and otherwise **DENIED**.


     /s/ Marianne B. Bowler
**MARIANNE B. BOWLER**
United States Magistrate Judge

---

Failure to file objections within the specified time waives the right to appeal the order.